**Jack Dale WALKER, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–89–508.**

Court of Criminal Appeals of Oklahoma.

Sept. 30, 1994.

Rehearing Denied Jan. 18, 1995.

Mark Graziano, Johnie O'Neal, Asst. Public Defenders, Tulsa, for appellant at trial.

Johnie O'Neal, Public Defender, Tulsa, for appellant on appeal.

David Moss, Asst. Dist. Atty., Tulsa, for state at trial.

Robert H. Henry, Atty. Gen., Diane Slayton, Asst. Atty. Gen., Oklahoma City, for State on appeal.

## OPINION

CHAPEL, Judge:

Jack Dale Walker was tried by jury and convicted of two counts of First Degree Malice Aforethought Murder in violation of 21 O.S.Supp.1982, § 701.7 (Counts I and II), one count of Assault and Battery with a Dangerous Weapon in violation of 21 O.S.Supp.1982, § 645 (III) and two counts of Assault with a Dangerous Weapon in violation of 21 O.S.Supp.1982, § 645 (IV and V), in Tulsa County District Court Case No. CRF–89–18, before the Honorable Clifford E. Hopper, District Judge. Walker was sentenced to ten years imprisonment for Counts IV and V and twenty years imprisonment for Count III. The jury found three aggravating circumstances and sentenced Walker to death for the murder convictions. We affirm.

## FACTS

On December 30, 1988, at around 8:00 a.m., Walker arrived at a trailer home where Shelley Ellison, his girlfriend and the mother of his three-month-old child, lived. The trailer belonged to Shelley's grandmother, Juanita Epperson. Shelley, the baby, Juanita, Juanita's son Donnie Epperson and his wife Linda and their four children, were all present in the trailer when Walker arrived.

Hansel Norton, who had known and worked with Walker for three weeks, had driven him to the trailer. Norton testified that on the way there Walker seemed very upset. Walker pulled out a knife and said to Norton "Talk to me." [1] Walker told Norton he had something to do before he came into work that day. At trial, Norton identified

1. Tr. 188.

the murder weapon as the knife Walker had shown him in the car.

Walker arrived at the trailer, told Juanita he was looking for Shelley, and she invited him inside. Walker and Shelley talked in a back bedroom. Apparently, Walker wanted to leave with the baby. When Shelley asked Juanita to explain to Walker that the baby was sick and that he could not take him, he attacked Shelley.

Shelley yelled for Donnie to come and help her. Donnie, who had been asleep, ran down the hall toward them. Walker stabbed Donnie and then continued stabbing both Donnie and Shelley. During the attack, Shelley managed to make a 911 call. When the police arrived, she was dead. Donnie was alert and conscious, but he died shortly thereafter. Shelley suffered more than thirty-two stab wounds; many were defensive ones. Donnie sustained eleven. Walker inflicted some of Shelley's wounds with an ice pick from Juanita's kitchen.

Juanita had tried to help Shelley and Donnie by hitting Walker with a pipe wrench. Walker pushed her down, breaking her arm, and then stabbed her. Linda, Donnie's wife, and their nephew had run down the hall after Donnie. At various times, Walker threatened them with the knife and chased them out of and away from the trailer. Walker's infant son and three other children who witnessed the events were unharmed.

When the police arrived, they found Walker lying on the front porch, his wrist bleeding. Juanita testified that Walker had cut his own wrist. She also stated that during the attack, Walker had said he was going to kill himself and had tried to push a paring knife into his own throat.

Police officers recorded a statement Walker gave to them on January 1, 1989. Walker stated he went to the trailer with the "full intention of either taking the baby or murdering [Shelley]."[2] He later contradicted himself, stating that "I didn't want to kill Shelley I wanted to kill myself because I knew that we needed somebody to take care of that baby."[3] Walker also stated that he knew Shelley was dead when the police arrived, because before he exited the trailer he checked her pulse.[4] He stated that he remembered stabbing Shelley.[5] He admitted that he used drugs, but stated that he was not under the influence of drugs at the time of the homicides.[6] Walker stated that before he left his grandfather's house to go to the trailer, he told him "Paw I love you and I don't know what's going to happen but I don't care...."[7] Walker also stated that "[o]ne of the things that provoked me so much to finally come to this was that Shelley's Mom and Dad both on several occasions had made threats on my life."[8] Finally, Walker stated that "[t]he knife at first was intended for myself because if me and her didn't work out I was going to walk out on the front porch and stab myself."[9]

## ISSUES RELATING TO JURY SELECTION

■ In his second proposition, Walker claims the trial court violated his state and federal constitutional rights by improperly restricting defense counsel during jury selection. During *voir dire*, defense counsel explained to one venireperson how the judge might instruct on mitigation evidence. The trial judge sustained the State's objection to this question. Defense counsel also told several venirepersons of evidence he considered mitigating as to Walker, and asked them whether they would also find such evidence to be mitigating. The State successfully objected, arguing that these questions asked the jurors to commit to a particular position on the issue of mitigation.

Despite these limitations upon his questioning, defense counsel was ultimately al-

---

**2.** Appellant's Brief, Exhibit "D" pg. 4.

**3.** *Id.* at 10.

**4.** *Id.* at 5.

**5.** *Id.* at 7.

**6.** *Id.* at 8.

**7.** *Id.*

**8.** *Id.* at 11.

**9.** *Id.* at 12.

lowed to define mitigating evidence as "any evidence that says, no, the death penalty shouldn't be imposed, ..."[10]; as evidence showing "why Jack Dale Walker should not receive the death penalty ..."[11]; and, as evidence that could determine "whether or not the death penalty really is appropriate" assuming Walker was found guilty of first degree murder.[12] Defense counsel was also allowed a lengthy conversation with one prospective juror during which he asked her whether she would be able to look for mitigating evidence, whether she would be able to share with the other jurors her thoughts on mitigating evidence, and whether she would be willing to stand up to eleven other jurors and refuse to impose the death penalty based upon her beliefs concerning the existence of mitigating factors.

The major thrust of Walker's second proposition argument is that the trial court's rulings prevented him from ascertaining whether the prospective jurors would fulfill their duty, under *Lockett v. Ohio*[13] and *Eddings v. Oklahoma*[14] to consider his mitigating evidence. Walker claims that to ascertain whether potential jurors will uphold their second stage duty to consider mitigating evidence, defense counsel must be allowed to describe particular pieces of mitigating evidence and ask each juror whether they would also consider them to be mitigating. By allowing Walker only limited inquiry into whether the jurors would give consideration to the mitigating evidence offered, the trial court prevented him from obtaining sufficient

information upon which to base peremptory challenges or challenges for cause. We disagree.

"The principles governing the sufficiency of voir dire questions derive from the Sixth Amendment guarantee of an impartial jury in criminal prosecutions."[15] "The purpose of voir dire ... is to ascertain whether there are grounds to challenge for either actual or implied bias [and] to permit the intelligent exercise of preemptory [sic] challenges,"[16] As long as the examination of prospective jurors is sufficiently broad to afford a defendant a jury not affected by outside influences, personal interests or bias, a judge's decision to limit questioning will not be ruled an abuse of discretion.[17] *Voir dire* rulings lay within the trial judge's discretion because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge."[18]

This Court has ruled that a trial judge's refusal to permit *voir dire* inquiry into jurors' views on particular mitigating factors does not constitute an abuse of discretion.[19] We have stated that permitting this type of questioning might result in improperly influencing the jury by making *voir dire* "an open forum for discussion of any circumstances accompanying the murder, both mitigating and aggravating."[20] Walker cites no state or federal case in which the subject of mitigating evidence in a capital case has been found to require a more detailed *voir dire* inquiry than is normally allowed.[21]

10. Tr. 133.

11. *Id.* at 142.

12. *Id.* at 153–54.

13. 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978).

14. 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

15. *United States v. Baker*, 638 F.2d 198, 200 (10th Cir.1980).

16. *Duvall v. State*, 825 P.2d 621, 631 (Okl.Cr. 1991).

17. *Id.*

18. *Ristaino v. Ross*, 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), *quoting Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1423, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting).

19. *See Sellers v. State*, 809 P.2d 676, 682 (Okl.Cr. 1991). *See also Fox v. State*, 779 P.2d 562, 569 (Okl.Cr.1989) (trial court did not abuse its discretion in refusing to allow defense counsel to ask prospective jurors which circumstances they might view as mitigating), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

20. *Sellers*, 809 P.2d at 682.

21. Walker cites *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), to support his claim that mitigation is so crucial in a capital case that prospective jurors' attitudes toward

After reviewing the *voir dire* transcript in the present case, it is clear that defense counsel was not so restricted that he was unable either to ascertain juror bias or to intelligently exercise peremptory challenges. Although the trial judge limited several of defense counsel's questions, he still explained mitigating factors to the prospective jurors. Accordingly, Walker's right to an impartial jury was not violated by the trial court's rulings restricting some of defense counsel's proffered questions on the subject of mitigating evidence.

## ISSUES RELATING TO GUILT/INNOCENCE

Walker argues in his first proposition that the trial court's decision to allow the State to examine his expert witness prior to trial violated his right to a fair trial under the Fifth, Sixth and Fourteenth Amendments. Prior to trial, defense counsel asked the court to appoint a psychiatrist (1) to determine whether Walker was sane at the time of the crimes and (2) to establish a defense against the State's allegations in its Bill of Particulars that Walker posed a continuing threat to society and that he had knowingly created a great risk of death to more than one person. The trial court appointed Dr. Robert Nicholson to examine Walker. On the day he set the trial date, the judge also ordered that Dr. Nicholson's final report concerning Walker be made available to the State prior to trial. While defense counsel claimed that he objected to this portion of the court's order, the

appeal record contains no documentary evidence of such an objection.

As of May 8, 1989, the day voir dire was to begin, the State had not received a copy of Dr. Nicholson's report.[22] Over defense counsel's objection, the trial court thus allowed the State to question Dr. Nicholson *in camera*. While the State claimed it was calling Dr. Nicholson to cover the issue of competency, the trial judge made it clear he was allowing the State to examine Nicholson prior to trial as a sanction because of defense counsel's failure to follow the court's order and timely provide the State with Nicholson's report. Dr. Nicholson then testified basically to the following: that although he had not been asked and had thus not tested Walker for competency to stand trial, he believed he was competent; that Walker was not insane when he committed the murders; that Walker was not a continuing threat to society; that Walker did not create a great risk of death to more than one person; and, that he had no opinion as to whether the murders were heinous, atrocious or cruel. Dr. Nicholson did not recount any of Walker's statements made to him during the psychiatric interviews.

Walker now claims the State should not have been allowed to discover the contents of Dr. Nicholson's report prior to trial. He claims that through its pretrial examination of Dr. Nicholson, the State was allowed to prepare a "devastating cross examination of the doctor in both stages, totally eliminating

---

specific, potential mitigators must be explored. In *Turner*, the Supreme Court held that in accordance with the Sixth Amendment right to an impartial jury, "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.* at 36, 106 S.Ct. at 1688. Walker claims that mitigation evidence in a death case poses a "special circumstance" which, like certain racial factors, may be explored in detail by defense counsel during voir dire. *See also Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); *Ristaino, supra*. In *Turner*, it was the "risk of racial prejudice infecting a capital sentencing proceeding" which motivated the Supreme Court to hold that capital defendants accused of interracial crimes are entitled to have their juries specifically questioned on the subject of racial bias. *Id.* at 35, 106 S.Ct. at 1688. Clearly, a jury composed of racially prejudiced jurors is not impartial.

The same cannot be said, however, of a jury composed of people who fail to find a capital defendant's mitigating evidence to be mitigating: the jury is entitled to reach this conclusion as long as it has followed the applicable instructions. Accordingly, the relevant inquiry on voir dire is whether each juror is willing to give consideration to the defendant's mitigating evidence.

**22.** On May 4, apparently anticipating that it would not receive the report prior to trial, the State subpoenaed Dr. Nicholson to appear in court on May 8 and to bring "[a]ll records, tests [sic] results, interviews with Jack Walker, interviews with other persons, information used to evaluate Jack Walker, [and] any reports and conclusions based upon such evaluation and examinations of Jack Walker." O.R. 120.

his effectiveness as a first and second stage witness."[23] Essentially, Walker argues his defense was rendered less effective because the State was allowed to discover before trial the evidence supporting it.

■ The trial court's order requiring Walker to give to the State a copy of Dr. Nicholson's report was in fact improper according to caselaw in effect at that time.[24] Several months after Walker's trial, this Court reaffirmed *Mills* in *J.D.L., Jr. v. State.*[25] *J.D.L.* taught that a *Mills* violation such as occurred in the present case could be harmless. The information sought will be disclosed when the State cross examines a defendant's expert witness, since such expert "may [at that time] be required to disclose the underlying facts or data" upon which his or her testimony is based.[26] Because the State in the present case would have been entitled to Dr. Nicholson's report during its cross examination of him,[27] the trial court's error in providing the State with this information before the trial was, according to *J.D.L.,* harmless.

While *J.D.L.* technically governs this particular issue, it provides no guidance concerning Walker's sweeping constitutionally-based criticisms of the discovery granted to the State in the present case. Walker argues that the State's pretrial discovery of Dr. Nicholson's report and opinions gave the State an unfair advantage, rendering his sole defense—no malice aforethought—worthless. Walker asserts the trial court's ruling deprived him of due process, a fair trial and the right to counsel. He also claims the ruling violated his psychotherapist-patient privilege as well as his privilege against compelled self incrimination.

It is clear that at the time of Walker's trial, there existed no statutory or caselaw means by which the State would have been allowed to discover Dr. Nicholson's report.[28] Neither were there any United States Supreme Court cases or Oklahoma Court of Criminal Appeals cases *specifically prohibiting* such a discovery mechanism on the state and federal constitutional grounds Walker now asserts. In fact, both the Federal Rules of Criminal Procedure[29] and the *ABA Standards for Criminal Justice*[30] sanctioned (and still sanction) prosecutorial discovery of reports or statements prepared or made by a witness the defendant intends to call at trial. Further, this Court relied in part upon the ABA Standards in fashioning the pretrial discovery procedures set forth in *Allen v. District Court of Washington County.*[31] *Allen* specifically provides that a report such as Dr. Nicholson's is discoverable by the State, as long as such report "is redacted ... to preclude disclosure of privileged communication."[32]

*Allen* was not in effect when Walker's trial occurred and can not be relied upon to support the trial court's order. However, the cases and standards *Allen* followed in devising the "two-way street" discovery rules in criminal prosecutions were in full force and effect at that time.[33] Those cases and stan-

---

23. Appellant's Brief at 25.

24. *See Mills v. Tulsa County District Court,* 770 P.2d 900 (Okl.Cr.1989) (no statutory authority to support State's pretrial discovery of defendant's psychiatric records, some of which had been prepared by state appointed psychiatrist for possible use in upcoming trial).

25. 782 P.2d 1387 (Okl.Cr.1989).

26. 12 O.S.1981, § 2705. *See also J.D.L.* at 1391.

27. Defense counsel did call Dr. Nicholson during the defendant's case in chief.

28. *See supra Mills* and *J.D.L.*

29. Fed.R.Crim.P. 16(b)(1)(B).

30. Standard 11–3.2.

31. 803 P.2d 1164 (Okl.Cr.1991).

32. *Id.* at 1168.

33. *See Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (trial judge's refusal to allow defense witness to testify was proper sanction imposed for defendant's failure to identify such witness pursuant to State's pretrial discovery request); *Wardius v. Oregon,* 412 U.S. 470, 473, 93 S.Ct. 2208, 2211, 37 L.Ed.2d 82 (1973) (development of discovery devices allowing both parties the maximum amount of information "enhances the fairness of the adversary system."); and, *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (privilege against self-incrimination not violated by requiring that defendant give pretrial notice of alibi defense and disclose alibi witnesses; due process not offended by truth enhancing rule insuring

dards, as well as the Federal Rules of Criminal Procedure, all support the constitutionality of allowing the State limited pretrial access to reports made by defense experts.[34]

In this case, the State was not simply provided with a copy of Dr. Nicholson's report, but was allowed to actually question Dr. Nicholson before trial. Contrary to Walker's present claim, this questioning did not rise to the level of a deposition in which the prosecutor asked Nicholson how he had reached his medical conclusions. Rather, it was a short *in camera* hearing during which the State essentially asked Nicholson what conclusions his report contained. Further, the State did not use Nicholson's *in camera* testimony to impeach him on cross examination during either the first or second stage of the trial. Accordingly, the State was not allowed more in depth discovery than what was eventually sanctioned in *Allen*.[35]

It does appear, however, that the State was provided with a version of Dr. Nicholson's report which had *not* been "redacted ... to preclude disclosure of privileged communication."[36] Walker claims generally that providing the State with the report violated the "psychotherapist-patient" privilege found at 12 O.S.1981, § 2503. However, Walker neither included Dr. Nicholson's report in his appeal record, nor described any privileged material contained in the report. Therefore, this Court has no means of determining whether the report contained any informa-

tion which would have violated section 2503 or *Allen*.[37] This proposition is denied.

■ In his third proposition, Walker claims the admission into evidence of a crime scene photograph and a 911 tape rendered his trial unfair. State's Exhibit 21 is a color photograph of Shelley Ellison as she lay dead on the floor of her grandmother's trailer. It graphically depicted the many stab wounds to her neck and the back of her head, and showed a lot of blood. Walker claims the photo was gruesome, that its prejudicial impact greatly outweighed its probative value, that its admission served only to inflame the jury, and that the wounds it depicted were described as post mortem, thereby reducing its probative value. He also argued that it was cumulative to State's Exhibit 20.

While State's Exhibit 21 was gruesome, its probative value was not outweighed by the danger of unfair prejudice.[38] This photo was properly admitted to depict the crime scene, show the location of wounds, and to corroborate the testimony of witnesses who saw the killing.[39] Another color photo and a black and white photo depicting Shelley's body were admitted in addition to Exhibit 21. Also admitted during the second stage of trial were a number of autopsy slides depicting her injuries in isolation. Despite the fact that there was some repetition, no error resulted from the admission of State's Exhibit 21.[40]

---

defendant as well as State pretrial opportunity to investigate facts necessary to determine guilt or innocence).

**34.** Even one author, who vehemently criticized *Allen, supra,* agreed that "[a]ffording the prosecutor pre-trial access to expert material the defense intends to utilize at trial will generally enhance the accurate presentation of expert testimony without infringing upon the defendant's constitutional rights or compromising the attorney-client relationship." Rodney J. Uphoff, *The New Criminal Discovery Code in Oklahoma: A Two-Way Street in the Wrong Direction,* 44 Okla. L.Rev. 387, 430 (1991).

**35.** *Supra.*

**36.** *Id.* at 1168.

**37.** *See also United States v. Dennison,* 937 F.2d 559, 566 (10th Cir.1991) (allowing prosecution

access to notes made by doctor who had interviewed defendant constituted harmless error), *cert. denied,* —— U.S. ——, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992).

**38.** *See* 12 O.S.1981, § 2403. *See also Clayton v. State,* 840 P.2d 18, 28 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993).

**39.** *See Trice v. State,* 853 P.2d 203 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Williamson v. State,* 812 P.2d 384, 400 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992).

**40.** *See Nguyen v. State,* 769 P.2d 167, 171 (Okl. Cr.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989), *overruled on other grounds in Green v. State,* 862 P.2d 1271, 1272–73 (Okl.Cr.1993).

Walker's sole defense at trial was that he did not act with malice aforethought when he committed these homicides. The number and severity of the wounds depicted in State's Exhibit 21 tended to support the prosecution's theory that these murders were in fact premeditated.[41] Even though several of these wounds were described at trial as post mortem, this fact did not deprive State's Exhibit 21 of its probative value on the issue of whether Walker specifically intended to and deliberately did kill his two victims. The trial judge did not abuse his discretion in admitting this photograph.[42]

■ Walker next claims that the trial court reversibly erred in admitting a 911 tape during the first stage of trial. Shelley Ellison managed to pick up the phone and dial 911 while she was being stabbed. She spoke with the operator for less than one minute, during which time she was screaming and exclaiming "He's killing me" and "I'm dead." State's Exhibit 24 was the tape recording of this conversation. Walker claims the tape was cumulative of the eyewitness testimony provided by Shelley's grandmother and aunt and that it was more prejudicial than probative. He also claims that a transcription of the tape, which defense counsel offered to provide to the jury, should have been admitted in place of the tape itself.

The 911 tape was not probative of any issue presented during the first stage of trial. During her conversation with the 911 operator, Shelley did not identify Walker as the assailant. Further, nothing about the tape recording helped to prove malice aforethought—the only element of the charged crimes which Walker contested. The tape was thus not only irrelevant under 12 O.S. 1981, § 2401, but was prejudicial, and the

trial judge abused his discretion in admitting it.[43] Given the undeniable and overwhelming evidence of guilt in this case, however, it is clear that admission of the tape did not contribute to Walker's conviction.[44] Accordingly, the trial court's error in admitting the tape was harmless.[45]

■ In the final portion of proposition three, Walker claims the trial judge committed reversible error when, shortly after the jurors began deliberating, he sent them the 911 tape recording and another exhibit tape of Walker's confession along with a note informing them they could request a "playing device" if they chose to listen to the tapes.[46] The two tapes were inadvertently omitted from the exhibits that were sent with the jury when it left to deliberate. The trial judge realized the tapes had been left out and sent them to the jury along with the note in question. Walker claims the jury could have viewed the trial judge's note as an indication that he thought the tapes were especially important pieces of evidence.

There is no Oklahoma caselaw rule or statute specifically prohibiting a trial judge from initiating communication with the jury once deliberations have begun. Rather, there are rules which, in recognition of the fact that post deliberation communications between jurors and third parties can prejudice the decision-making process, place restrictions upon such potential exchanges.[47] Those restrictions were not violated in this case.

Title 22 O.S.1981, § 894, which sets forth the procedure trial courts must follow when jurors have a question after they have begun deliberations, does not by its terms specifically apply to the situation in Walker's case. Because Walker's case involved post deliberation communications between the jury and

41. See Hooks v. State, 862 P.2d 1273, 1281 (Okl. Cr.1993).

42. See Trice, 853 P.2d at 204.

43. But see Pickens v. State, 850 P.2d 328, 335 (Okl.Cr.1993) (911 tape recording of robbery was not more prejudicial than probative and was thus properly admitted).

44. See Booker v. State, 851 P.2d 544, 547 (Okl.Cr. 1993), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

45. See Mann v. State, 856 P.2d 992, 995 (Okl.Cr. 1993).

46. The note read as follows:

Attached are the 2 exhibits (tapes) admitted into evidence. If or when you desire a playing device you may communicate with the court.

47. See 22 O.S.1981, § 857.

judge, however, the section 894 procedure arguably should have been followed. That procedure would have required the trial judge to call the jury into open court and present the omitted tapes and any comment in the presence of counsel for both sides.

While the record is unclear, it is reasonable to assume that because the trial judge communicated with the jurors via written message, he did not call them into the courtroom to present them with the omitted exhibits. However, it appears that defense counsel was present when the judge sent the note, and that he even objected to the court's message that a tape player would be made available to the jury. This became apparent during a subsequent, transcribed exchange between judge and jury when defense counsel made the following statement:

> Judge, when the Court gave the jury the note about the tape player being available, **I expressed at that time to the Court that we would object to the tape player being made available so that the jury could listen to the tapes** during their deliberations.[48]

The purpose of the section 894 procedure "is to prevent certain communications from being made outside of open court which might influence the jury when both parties of the adversary proceeding have not at least

had a chance to be present to protect their interests."[49] Defense counsel in this case was present and objected when the judge sent to the jury the message about the omitted tapes and tape player. We find that the trial court's failure to call the jury into open court constituted only a technical violation of section 894 which does not warrant reversal.[50]

■ Yet, the question remains whether the trial judge's message concerning the availability of a cassette player caused any juror to place special emphasis upon the 911 tape and the tape of Walker's confession. After reviewing the record, we find that the wording in the note did not encourage the jury to ask for a cassette player. We agree with the trial judge's reasoning, as reflected in the transcript, that these exhibits to which the jury was entitled were worthless pieces of evidence without a cassette player. This proposition is denied.

■ Walker argues in his fourth proposition of error that the trial court erred in refusing to administer his requested instruction on the lesser offense of first degree manslaughter. He claims the evidence did not support the administered instruction on the lesser offense of second degree murder. Therefore, he reasons, the jury was faced

---

48. Tr. 419 (emphasis added).

49. *Boyd v. State*, 572 P.2d 276, 280 (Okl.Cr. 1977).

50. Several cases from this Court set forth a general rule governing all post deliberation communications between judge and jury. According to those cases, "[w]hen a communication between judge and jury occurs, after the jury has retired for deliberation, a presumption of prejudice arises." *Givens v. State*, 705 P.2d 1139, 1142. (Okl.Cr.1985). *See also Clonce v. State*, 588 P.2d 584, 589 (Okl.Cr.1978). After tracing this "general rule" to its inception in *Wilson v. State*, 534 P.2d 1325 (Okl.Cr.1975), however, it is clear that in its original form, it was not a general rule governing all post-deliberation communications between judge and jury but a specific standard which applied only to violations of 22 O.S.1981, § 894. *See Green v. State*, 281 P.2d 200, 202 (Okl.Cr.1955) ("Upon failure of a trial court to comply with [section 894], the authorities hold presumption of prejudice arises."), *overruled on other grounds in Wilson v. State*, 534 P.2d 1325, 1327 (Okl.Cr.1975). Thus, according to the clear

wording of section 894 and its pre-*Wilson* interpretation, post deliberation communications between judge and jury are not themselves presumptively prejudicial. Rather, prejudice arises when the trial court communicates with the jury outside the parameters of section 894. While the trial judge in Walker's case did not call the jury into open court to present it with the omitted tapes, he apparently conducted the exchange in the presence of defense counsel. Although this constituted a technical violation of the "open court" requirement of section 894, the trial court's actions remained within the spirit of the statute because defense counsel was present and informed. *See Boyd*, 572 P.2d at 280 (purpose of section 894 is to prevent communications from being made to jury without counsel's knowledge). Thus, prejudice should not be presumed.

*See Worchester v. State*, 536 P.2d 995, 1001 (Okl.Cr.1975) (although trial court's failure to call jury into open court constituted a technical violation of section 894, any error was harmless). *See also Bosin v. State*, 565 P.2d 1061 (Okl.Cr. 1977) (trial judge's failure to call jurors back into open court before delivering answers to their written questions did not prejudice defendant).

with either convicting him of first degree murder or acquitting him. The trial judge refused the requested manslaughter instruction on two grounds: first, the evidence did not support a manslaughter instruction; and second, Walker's defense theory throughout trial was that he had committed second rather than first degree murder. The trial judge's ruling was a sound exercise of discretion.

The evidence did not in fact support a first degree manslaughter instruction.[51] First degree manslaughter is defined as homicide "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."[52] Second degree murder is homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; ...."[53] Walker went to the trailer with a concealed, sharpened knife. He became angry with Shelley and began either hitting or stabbing her. When her uncle, Donnie, came running to her rescue, Walker stabbed him in the stomach. Walker then stabbed each of them numerous times, ultimately telling Donnie that he should have minded his own business. At one point, he went to the kitchen cabinets, found an ice pick, and returned to stab Shelley with it. He took Shelley's pulse to make certain she was dead. In his statement to the police, he admitted that he intended to kill anyone who tried to prevent him from taking the baby. This evidence did not show that Walker killed the two victims in a heat of passion and without a design to effect their deaths. The trial judge properly denied Walker's requested instruction on this basis.

Further, Walker's defense theory throughout trial was that he committed second rather than first degree murder. Walker did not claim during trial that he committed the homicidal acts "without a design to effect death," and was thus guilty only of first degree manslaughter. Rather, his trial defense was that he committed the murders with a depraved mind and without malice aforethought.[54] This proposition is denied.

■ In proposition five, Walker claims the trial court erred in refusing to administer his requested instruction on specific intent. Walker unsuccessfully requested the trial court to instruct the jury as follows:

[T]he crime charged in this case is a crime which requires proof of specific intent before a Defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the State must prove that a Defendant knowingly did an act which the law forbids, that is, purposely intending to kill, and that (s)he did it with the specific intent necessary to establish all of the elements of the crime charged. Such intent may be determined from all of the facts and circumstances surrounding the case.[55]

---

51. *See Boyd v. State,* 839 P.2d 1363, 1367 (Okl. Cr.1992).

52. 21 O.S.1981, § 711(2).

53. 21 O.S.1981, § 701.8(1).

54. During opening statement, defense counsel argued Walker was in a state of rage when he killed the two victims, concluding that he "did commit a murder, but not murder in the first degree." Tr. 185. Defense counsel reiterated this position, stating that Walker "did not commit premeditated, first degree murder.... Murder, yes, but not Murder in the First Degree." *Id.* Again, during first stage closing argument, defense counsel argued that Walker merely lost control before the homicides, and that he had no specific intent to kill his two victims. He claimed Walker's acts "evince[d] a depraved mind," and that the State had proven "Murder in the Second Degree, not Murder in the First Degree." Tr. 409. Even though defense counsel introduced testimony that Walker suffered from "borderline personality disorder" and was very upset and possibly suicidal prior to entering the trailer, he never asked the jury to conclude that Walker's alleged state of mind rendered him "incapable of forming a design to effect death...." *Allen v. State,* 821 P.2d 371, 374 (Okl.Cr.1991) (emphasis added). Rather, defense counsel argued this evidence showed that Walker had no *premeditated* design to effect their deaths.

55. O.R. 150.

He reasons that without this instruction, the jury could have thought his general intent to strike or stab supplied the first degree murder element of malice aforethought. According to Walker, the trial court's instruction describing malice aforethought as the "deliberate intention to take away the life of a human being" [56] did not sufficiently describe and explain that required element.[57]

"Determination of which instructions shall be given to the jury is a matter within the discretion of the trial court, provided that the instructions given fairly and correctly state the applicable law." [58] The trial court's exercise of discretion will be upheld if the instructions given were substantially the same as the one requested but refused.[59] Further, an applicable uniform instruction "shall be used unless the court determines that it does not accurately state the law." [60] The trial court properly exercised its discretion in refusing Walker's requested instruction on specific intent. This proposition is denied.

■ In his eighth proposition, Walker claims that accumulation of error during the guilt/innocence phase of his trial warrants reversal. When individual errors alleged are without merit, there can be no error by accumulation.[61] This proposition is denied.

## ISSUES RELATING TO PROSECUTORIAL MISCONDUCT

Walker asserts in proposition six that the prosecutor committed reversible error by injecting Walker's character into the first stage of trial. Over defense counsel's objection, the prosecutor during the first stage of trial asked several defense witnesses whether Walker had a propensity toward violence. During cross examination of Dr. Nicholson, the prosecutor also asked a number of questions concerning whether Nicholson had considered certain specific instances of Walker's past violent conduct in reaching his conclusion that Walker simply lost control of himself and did not intend to kill his victims. Defense counsel raised only one objection during this allegedly prejudicial line of questioning. Walker now claims that both the preserved and unpreserved error allegedly caused by the State's questioning warrant reversal.

■ "The extent of cross-examination of any witness rests in the sound discretion of the trial court." [62] Reversal is warranted only if there was an abuse of discretion resulting in prejudice to the defendant.[63] In fact, the trial court may even allow cross examination to *exceed* the scope of direct if it "reasonably tends to explain, contradict or impeach the witness's testimony." [64] When defense counsel opens up a "field of inquiry" during direct examination of a witness, he or she cannot complain if the prosecution cross examines on the same subject.[65]

■ A review of the record reveals that defense counsel's direct examination questions of the two witnesses other than Dr. Nicholson opened the field of inquiry as to Walker's violent tendencies and thus enabled the State to cover this same subject during cross examination. Walker placed his character in issue by calling these witnesses to testify about whether he had ever threatened the victims. The State was thus entitled to

**56.** *Id.* at 208.

**57.** *See also* OUJI–CR 428. We note the trial court's instruction on malice aforethought was verbatim OUJI–CR–428.

**58.** *Sadler v. State*, 846 P.2d 377, 386 (Okl.Cr. 1993).

**59.** *See Pack v. State*, 819 P.2d 280, 284 (Okl.Cr. 1991); *Fritz v. State*, 811 P.2d 1353, 1367 (Okl. Cr.1991).

**60.** 12 O.S.1981, § 577.2. *See also Palmer v. State*, 788 P.2d 404, 408 (Okl.Cr.1990).

**61.** *See Shelton v. State*, 793 P.2d 866 (Okl.Cr. 1990).

**62.** *Castro v. State*, 844 P.2d 159, 170 (Okl.Cr. 1992).

**63.** *Id.*

**64.** *Caffey v. State*, 661 P.2d 897, 903 (Okl.Cr. 1983).

**65.** *See Ashinsky v. State*, 780 P.2d 201, 206 (Okl. Cr.1989).

introduce evidence of bad character during cross examination.[66]

The State was also entitled to introduce during its cross examination of Dr. Nicholson specific instances of Walker's previous violent acts. Defense counsel objected only once to several of the State's questions of Dr. Nicholson concerning Walker's prior violent acts. The State also asked Nicholson whether his ultimate diagnosis of Walker would have been different had he taken these incidents into account. These questions contradicted Dr. Nicholson's testimony that Walker's mental disorder rendered him incapable of forming the specific intent to kill the two victims.[67] The questions helped the jury understand which information Dr. Nicholson did and did not consider in diagnosing Walker.[68] This proposition is denied.

In proposition seven, Walker claims that prosecutorial misconduct during *voir dire*, first stage of trial and first stage closing warrants reversal. Of approximately thirteen allegedly improper prosecutorial comments, Walker objected only four times. Accordingly, he has waived all but plain error regarding the remaining nine.[69] A review of these nine unobjected to comments reveals they were not so prejudicial as to affect Walker's right to a fair trial.[70]

 Three of the four defense objections at issue in this proposition were raised during the first stage of trial. First, defense counsel unsuccessfully objected when the prosecutor asked the medical examiner whether a wound on Shelley's hand was consistent with her having grabbed a knife which was then pulled away. Walker now claims the medical examiner was not qualified to give an opinion on this matter, and that the prosecutor's question only served to

inflame the jury. However, the medical examiner clearly was qualified to answer questions regarding the nature and extent of the victim's wounds. Further, evidence concerning the victim's defensive wounds was relevant since it supported the element of malice aforethought.[71]

 Second, defense counsel unsuccessfully objected when the prosecutor showed Walker's grandfather the murder weapon and asked him whether a person would need a knife like that to do masonry work. The witness had just testified that on the morning of the murders, Walker left the house where the two were living to go to his job—a job involving brickwork. Defense counsel had used this witness to support its theory that Walker did not intend to kill his victims. Evidence showing that Walker had left his grandfather's house in possession of a murder weapon rather than with a tool useful at his place of employment was relevant to show that he had formed the requisite malice aforethought.[72]

 Third, defense counsel unsuccessfully objected when the prosecutor asked a witness on cross examination whether she could say that Walker had not stabbed Shelley thirty-two times and Donnie eleven times. On direct, defense counsel had asked this witness whether Walker had threatened to hurt anyone on the night before the murders; she had testified that he had not made any such threats. The prosecutor's question to this witness was a proper impeachment tactic. *See supra* proposition VI.

Finally, defense counsel interposed an objection during first stage closing to the following prosecutorial comment: "[V]ery early

---

66. *See Walters v. State*, 848 P.2d 20, 23 (Okl.Cr. 1993). *See also Crumley v. State*, 815 P.2d 676, 679 (Okl.Cr.1991).

67. *See Caffey*, 661 P.2d at 903.

68. *See, e.g., Harris v. State*, 777 P.2d 1359, 1362 (Okl.Cr.1989).

69. *See Cannon v. State*, 827 P.2d 1339 (Okl.Cr. 1992).

70. *Camron v. State*, 829 P.2d 47 (Okl.Cr.1992).

71. *See, e.g. Henderson v. State*, 661 P.2d 68, 69 (Okl.Cr.1983) (premeditation or a design to effect death may be proven by facts showing that victim twice unsuccessfully attempted to escape from his attacker).

72. *See Koonce v. State*, 696 P.2d 501, 505 (Okl. Cr.1985) (evidence that defendant went to victims' residence with loaded shotgun is relevant to prove malice aforethought), *overruled on other grounds in Landtroop v. State*, 753 P.2d 1371, 1372 (Okl.Cr.1988).

in these proceedings you were satisfied. You got the right guy.... You do not have to wonder if you get to that second stage whether or not you've got the right guy. You don't have to wonder now." [73] Walker claims that because there was never any question as to whether he had committed the acts with which he was charged, the prosecutor's statement effectively convinced the jury it could return a verdict of guilty prior to hearing evidence, reading the instructions, or even deliberating. However, the prosecutor was simply reiterating what the evidence clearly showed and what defense counsel specifically conceded during his opening statement: that Walker had committed all of the criminal acts alleged. The prosecutor was reminding the jury that the issue was not generally whether Walker had committed those acts, but specifically whether the two killings constituted murder in the first degree. This proposition is denied.

## ISSUES RELATING TO PUNISHMENT

Walker claims in his ninth proposition of error that second stage admission of gruesome and inflammatory autopsy slides warrants reversal. The trial judge held an *in camera* hearing at the beginning of the sentencing phase to determine whether to admit all or some of the twenty-two slides at issue in this proposition. Dr. Hemphill, the medical examiner who had reviewed the autopsy slides and other pertinent records but had not performed the autopsies, described the wounds depicted in each slide. The trial court admitted the slides over defense counsel's continuing objection that they were gruesome, repetitive, and failed to support the heinous, atrocious or cruel aggravator.

Photos depicting the location of wounds or corroborating a medical examiner's testimony are relevant.[74] Yet, relevant photos may be excluded if their "probative value is substantially outweighed by the danger of unfair prejudice,...." [75] Whether to introduce photos of a homicide victim is a decision largely within the trial judge's discretion.[76]

The twenty-two slides at issue were relevant and were not so prejudicial that they should have been excluded. They corroborated the medical examiner's testimony that some of the wounds were defensive, were incurred when the victims were alive, and were thus painful. Accordingly, they supported the State's claim that the murders were heinous, atrocious or cruel. All but one of the slides depicted the victims' wounds in a very sterile, almost blood-free condition.[77] While some repetition of wounds may have occurred, that is understandable given the fact that one victim incurred thirty-two stab wounds and another eleven.[78] This proposition is denied.

In his tenth proposition, Walker argues the prosecutor deprived him of various state and federal constitutional rights by introducing second stage aggravation evidence without having first notified the defense. According to 21 O.S.Supp.1987, § 701.10, "[o]nly such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible" during second stage proceedings. We have held that section 701.10 does not require the State to give a *detailed description* of anticipated second stage evidence.[79] Rather, that section only requires the State to provide a capital defendant with "a summary of the evidence in-

---

73. Tr. 388–89.

74. *See Williamson*, 812 P.2d at 400; *Trice*, 853 P.2d at 212.

75. 12 O.S.1991, § 2403. *See also Clayton*, 840 P.2d at 28.

76. *Trice*, 853 at 212.

77. Slide number 43 showed Shelley on a gurney prior to the autopsy, laying on a bloodied sheet. It should be noted, however, that this slide did not reveal any additional wounds incurred during the autopsy. The wounds depicted in this slide were the ones Shelley received during the killing and were not in any way exacerbated by subsequent medical procedures. *See Harless v. State*, 759 P.2d 225, 227 (Okl.Cr.1988) (photo depicting victim's face as more swollen than it actually was after the injuries held inflammatory and prejudicial).

78. *McCormick v. State*, 845 P.2d 896, 898 (Okl. Cr.1993).

79. *See Williamson*, 812 P.2d at 130.

tended to support the alleged aggravating circumstances, and a list of witnesses the State might call."[80] The purpose of this pretrial notice requirement is "to allow the defendant time to present a defense or an explanation for alleged criminal misconduct."[81] Stated in more general terms, its purpose is "to apprise the defendant of evidence relevant to sentencing which will be introduced for the first time in the sentencing hearing."[82] "[F]ailure to object to lack of notice, either at a pre-trial hearing or at the time the challenged evidence is offered, will result in waiver of this statutory right."[83]

▮ Walker first attacks the slides, claiming they were not specifically described in the State's Amended Notice of Evidence in Aggravation of Punishment. Because Walker filed a pretrial motion claiming the State had failed to adequately apprise him of the evidence to be used to prove the heinous, atrocious or cruel aggravator, this error has technically been preserved for review under the standard set forth in *Green, supra.* However, the allegation has no merit. While the term "slides" was not specifically used in the State's notice document, that document did provide that all "photographs *of the autopsy not previously introduced in the guilt stage*" would be introduced to support the heinous, atrocious or cruel aggravator.[84] This complies with the requirement that the State provide a capital defendant with a *summary* of the aggravation evidence it intends to present. Further, these were autopsy slides which provided the only means of conveying to the jury in medical terms the extent and nature of the victims' injuries. Defense counsel could not reasonably have been surprised when the State introduced them to support the heinous, atrocious or cruel aggravator.

▮ Walker next claims he was not adequately apprised that Dr. Hemphill, the medical examiner, would offer his opinion that Shelley was injured at the time she placed the 911 call. Walker is particularly disturbed by Hemphill's testimony that Shelley sounded during this call as if she were spitting blood.[85] Again, the State was not required to describe in its notice document the doctor's exact testimony. Walker was adequately notified from the summary of witness testimony the State provided that the witnesses would be asked questions relevant to proving the heinous, atrocious or cruel aggravator.

Third, Walker claims the State failed to tell him that Dr. Hemphill would be asked whether the victims suffered torture or serious physical abuse prior to their deaths. The State was not required to outline each question it would ask its witnesses. This allegedly improper question was well within the parameters of the State's notice.

Fourth and finally, Walker claims some of the State's cross examination questions violated the section 701.10 notice requirement. However, the section 701.10 notice requirement has never been extended to cover questions the State is entitled to ask during cross examination. And, Walker does not claim the State exceeded the proper bounds of cross examination. Further, all the matters about which Walker now complains had already been introduced during the guilt stage of trial. Under these circumstances, the pretrial notice requirement was met.[86] This proposition is denied.

---

**80.** *Wilson v. State,* 756 P.2d 1240, 1245 (Okl.Cr. 1988), *quoting Walker v. State,* 723 P.2d 273, 285 (Okl.Cr.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986).

**81.** *Wilson,* 756 at 1245.

**82.** *Boyd,* 839 P.2d at 1368.

**83.** *Green v. State,* 713 P.2d 1032, 1038 (Okl.Cr. 1985), *cert. denied* 479 U.S. 870, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986), *overruled on other grounds in Brewer v. State,* 718 P.2d 354, 365, n.

1 (Okl.Cr.1986). *See also Hayes v. State,* 845 P.2d 890, 893 (Okl.Cr.1992).

**84.** O.R. 73.

**85.** Defense counsel did not object on a lack of notice basis when this testimony was offered.

**86.** *See Boyd,* 839 P.2d at 1368 (pretrial notice requirement satisfied when evidence in question had already been introduced during the guilt phase).

 In proposition eleven, Walker claims the trial court erred in allowing Dr. Hemphill to testify that the victims suffered serious physical abuse prior to their deaths. Walker's argument here is that when Dr. Hemphill offered this opinion, he effectively instructed the jury to conclude that Walker was "guilty" of committing a heinous, atrocious or cruel murder. Indeed, we have held that several sections of the Evidence Code "should operate to bar admission 'of opinions which would merely tell the jury what result to reach....'"[87] However, Dr. Hemphill's testimony does not fall within this category of inadmissible evidence. His testimony was properly presented to aid the jury in determining whether Shelley and Donnie in fact suffered prior to their deaths. Dr. Hemphill's testimony also helped the State meet its burden to prove the existence of the heinous, atrocious or cruel aggravator.[88] Finally, as a medical doctor who had reviewed the record of the victims' injuries and subsequent medical treatment and was professionally capable of determining the severity of those injuries as well as whether the injuries were pre or postmortem, Dr. Hemphill was properly considered an expert on the "serious physical abuse" issue.[89] This proposition is denied.

Walker claims in his twelfth proposition that the trial court erred in failing to strike on the basis of insufficiency the heinous, atrocious or cruel aggravator. The test to be applied in determining the sufficiency of evidence supporting an aggravator is "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed."[90] When determining the sufficiency of evidence supporting an aggravator, this Court must view that evidence in the light most favorable to the State.[91]

Walker claims this Court's decision in *Brown v. State*[92] is controlling. The victim in *Brown* was shot seven times. However, the pathologist could not conclusively determine at what point in time the two potentially fatal wounds were inflicted. We concluded that the evidence did not establish the requisite torture or serious physical abuse. Walker argues that because Shelley and Donnie died "quickly," and because of the large number of postmortem wounds Shelley suffered, the facts of this case, like those in *Brown*, fail to support the heinous, atrocious or cruel aggravator. We disagree.

 According to the facts presented at trial, Shelley was stabbed *at least* thirty-two times. While approximately fourteen of these wounds were inflicted while Shelley was dying and possibly insensible, the remaining seventeen were inflicted while she was alive and probably conscious. Although Dr. Hemphill testified that some of these premortem wounds might have been inflicted while Shelley was unconscious, the many defensive wounds she incurred establish she was quite alert and active during much of the attack. Further, Shelley sustained injuries on both the front and back of her body, suggesting she and her attacker frequently changed positions during the ordeal.[93]

87. *Moore v. State*, 788 P.2d 387, 399 (Okl.Cr. 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990), *quoting* 1 L. Whinery, *Guide to the Oklahoma Evidence Code* 243, 254 (1985).

88. *See Nguyen*, 769 P.2d at 174 (since "no evidence [had been] presented to the trier of fact to indicate whether either [victim] suffered prior to death," this Court dismissed the heinous, atrocious or cruel aggravator).

89. Walker also claims that some of the information the doctor relied upon in reaching his conclusion was inadmissible hearsay. This issue is resolved in footnote 93, *infra*.

90. *Woodruff v. State*, 846 P.2d 1124, 1147 (Okl. Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct.

349, 126 L.Ed.2d 313 (1993). *But see Crawford v. State*, 840 P.2d 627, 641 (Okl.Cr.1992) ("We find that the record fails to present a sufficient evidentiary basis upon which a *reasonable trier of fact* and this Court could find the requisite torture or serious physical abuse to support the especially heinous, atrocious, or cruel aggravating circumstance.").

91. *Woodruff*, 846 P.2d at 1147.

92. 753 P.2d 908, 909–11 (Okl.Cr.1988).

93. *Compare Hayes*, 845 P.2d at 892 (requisite torture or serious physical abuse not shown where victim sustained no defensive wounds and evidence supported conclusion that she was rendered unconscious prior to sustaining most of her injuries).

Donnie was stabbed eleven times with a large knife. At some point during or after Walker's attack, Donnie called out to his mother for help and to tell her he was dying. According to medical records which Dr. Hemphill had reviewed, Donnie was awake and complaining of abdominal pain when he subsequently arrived at the hospital.[94] Dr. Hemphill also testified that Donnie sustained a defensive wound, further indicating that he was conscious at the time he was injured. Finally and most significantly, all wounds were inflicted prior to Donnie's death. Dr. Hemphill testified that in his opinion, the wounds Donnie suffered would have been very painful. The evidence presented was sufficient to support the jury's findings that these victims suffered torture or serious physical abuse. This proposition is denied.

In proposition thirteen, Walker urges this Court to set aside the heinous, atrocious or cruel aggravator, claiming the instruction[95] which defined it failed adequately to limit the jury's discretion as required by *Stouffer v. State*.[96] He further attacks the instruction on the basis that it was different from standard instruction OUJI–CR 436.

As previously noted, trial courts are to administer uniform instructions when those instructions correctly state the applicable law.[97] We have held that while the failure to follow section 577.2 constitutes a technical error, it is harmless if the instructions given fairly and accurately state the applicable law.[98] While instruction number seven closely paralleled OUJI–CR 436, it did contain some language which is not included in any of the uniform instructions. Thus, we must review the instruction to determine whether it was adequate.

Instruction number seven actually placed more limits upon the jury's discretion than OUJI–CR 436 would have.[99] The trial judge began by telling the jury that the heinous, atrocious or cruel aggravator "applies only to those murders which are elevated, by the circumstances of the murder, beyond other murders."[100] He then explained to the jury that while every murder might seem to meet this standard, they in fact do not: "What is intended to be included in [this class of murders] are those cases where the commission of the offense was accompanied by such additional acts as to set the crime apart from the norm of first degree mur-

---

94. Walker claims Donnie's statements as presented through these medical records constituted inadmissible hearsay. *See* 12 O.S.1981, § 2803(6). *See Walker v. State*, 826 P.2d 1002, 1006 (Okl.Cr.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992); *Jones v. State*, 660 P.2d 634, 642 (Okl.Cr.1983) (before information is admitted under this section, proponent must call as a witness "someone who could testify that the report was in fact made at or near the time and by, or from information transmitted by, a person with knowledge of the circumstances reported."). However, hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted; ...*." 12 O.S.1981, § 2801(3). Donnie's statement to the medical technicians was not offered to prove that he was in pain. They were offered to prove that he was conscious—that the injuries inflicted upon him did not cause immediate death or unconsciousness. The prosecutor's question to Dr. Hemphill supports this conclusion: "Doctor, does your information that you have there anywhere indicate some length, at least some length of time that Donnie Epperson was conscious?" Tr. 492.

95. The instruction at issue was trial court's instruction number seven. *See* O.R. 232.

96. 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988).

97. *See* 12 O.S.1981, § 577.2. *See also Palmer*, 788 P.2d at 408.

98. *See Smallwood v. State*, 763 P.2d 142, 144 (Okl.Cr.1988). *See also Brown v. State*, 777 P.2d 1355, 1358 (Okl.Cr.1989) (failure to give applicable uniform instruction harmless since it neither resulted in miscarriage of justice nor constituted a substantial violation of a constitutional or statutory right).

99. That instruction reads as follows:

As used in these instructions, the term 'heinous' means extremely wicked or shockingly evil; 'atrocious' means outrageously wicked and vile; 'cruel' means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
 The phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

100. O.R. 232.

ders." [101] Finally, the trial judge reminded the jury, in accordance with OUJI–CR 436, that "the application of [this aggravator] is limited and restricted to only those murders where the death of the victim was preceded by torture of the victim or serious physical abuse." [102] This instruction properly channeled the sentencer's discretion.

In propositions fourteen and eighteen, Walker launches several attacks against the continuing threat aggravator. First, he claims that his death sentence must be vacated because of the vague and overbroad trial application and appellate review of this aggravating circumstance. This argument has been consistently rejected. [103] Secondly, he claims the continuing threat aggravator is being unconstitutionally applied and reviewed. This Court recently upheld the constitutionality of the continuing threat aggravator. [104] These propositions are denied.

In proposition fifteen, Walker claims that Oklahoma's death penalty scheme affords prosecutors unbridled discretion in seeking death sentences. We recently denied this argument in *Romano v. State*. [105] However, Walker asks this Court to alter its course and follow a federal district court's opinion which concluded that the Illinois death penalty statutes violated the Eighth Amendment because it allowed consideration of a death sentence only "where requested by the State." [106]

After reviewing *Silagy*, it is clear that the infirmities found to have existed in the Illinois death penalty statutes do not exist in Oklahoma's. First, Oklahoma prosecutors do not have the discretion to decide whether to conduct a death sentencing hearing. According to 21 O.S.Supp.1987, § 701.10(A), once a defendant is convicted or adjudicated guilty

of first degree murder, "the court *shall* conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, . . . ." (Emphasis added). Second, unlike the Illinois death penalty scheme, Oklahoma's statutes require prosecutors to present their aggravating evidence to defendants *prior to trial.* [107] As we stated in *Romano*, "sufficient guidelines exist to properly direct prosecutorial discretion in making the decision whether to seek the death penalty." [108] This proposition is denied.

Walker claims in proposition sixteen that the trial court committed reversible error in allowing Deputy Dan Fritz to testify. Deputy Fritz was guarding Walker the morning after Walker arrived at the hospital to receive treatment for his self-inflicted wounds. He testified he was present when Walker made the following statements to an attending physician (Dr. Holden, a psychiatrist) and nurse; that he [Walker] knew he had killed Shelley and was glad; that he was sorry he had killed Donnie, but that Donnie had gotten involved in something that was none of his business; that two months prior to the murders, he had planned to kill his parents with a gun; and, that he was taking steroids and no one could push him around.

After the doctor and nurse left, Walker sat up in his bed and tried to loosen his restraints. When Deputy Fritz told him to lay down, Walker told him "Fuck you, mother fucker, I'll kill you too." [109] The State listed this testimony in its Amended Notice of Evidence in Aggravation of Punishment as evidence it intended to use to support the continuing threat aggravator. Walker objected to Fritz's trial testimony on the grounds that

**101.** *Id.*

**102.** *Id.* at 232.

**103.** *See Allen v. State*, 871 P.2d 79 (Okl.Cr.1994); *Williamson*, 812 P.2d at 410.

**104.** *See Malone v. State*, 876 P.2d 707 (Okl.Cr. 1994).

**105.** 847 P.2d 368, 392–93 (Okl.Cr.1993), *affirmed, Romano v. Oklahoma*, —— U.S. ——, 114 S.Ct.

2004, 129 L.Ed.2d 1 (1994). *See also Crumley*, 815 P.2d at 678.

**106.** *U.S. ex rel. Silagy v. Peters*, 713 F.Supp. 1246 (C.D.Ill.1989), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991).

**107.** *Id.*

**108.** *Id.*, 847 P.2d at 393.

**109.** Tr. 472.

it violated the physician-patient privilege set forth in 12 O.S.1981, § 2503.

Walker's argument on appeal reiterates the section 2503 privilege. The State claims Walker spoke in the presence of Deputy Fritz and thereby waived the privilege.[110] Walker claims that to show such waiver, the State has the burden to prove Walker was aware of Deputy Fritz's presence at the time he spoke with the doctor. However, this Court in the context of the attorney/client privilege has held that "the burden is upon the one making the objection to show ... facts to bring the evidence within the terms of the statute pertaining to privileged communications."[111] We thus conclude that Walker must bear the burden of proving that his section 2503 privilege was violated.

Walker has failed to show that his communication to Dr. Holden was not intended to be disclosed to third persons, and has thus failed to meet the section 2503 requirements necessary to support his claim of privilege. While neither Walker nor the State provides any information regarding Deputy Fritz's proximity to Walker at the time the statements were made, it is clear those statements were sufficiently loud to enable Fritz to hear them. Walker claims he was under heavy sedation when he spoke to Dr. Holden. Although there was evidence Walker had been given valium, he does not provide specific evidence to show that this medication rendered him incapable of understanding what he was doing when he uttered the statements at issue. In fact, Walker's lucid, correct answers to Dr. Holden's questions suggest he was quite cognizant of what was happening. Walker's statements, as provided through Deputy Fritz's testimony, were properly admitted as admissions against interest.[112]

Walker claims in proposition seventeen that improper prosecutorial remarks deprived him of a fair sentencing procedure. He cites eight instances of alleged prosecutorial misconduct. Five of them received no objections. Our review of these unobjected to remarks reveals no plain error.[113]

In the first comment to which Walker objected at trial, the prosecutor said, "I want you to give the death penalty because it's right, because it puts a value on life...."[114] Walker claims the prosecutor was improperly expressing his personal opinion that Walker deserved the death penalty.[115] Taken alone, the prosecutor's comment appears to have been an improper expression of opinion. In the context of the particular argument the prosecutor was making at the time, however, it was a proper recommendation based upon evidence supporting the alleged aggravating circumstance. This interpretation is supported by what the prosecutor stated just before making the comment at issue: "You are the jury, it is your responsibility to decide whether he did it and [whether] what he did and what kind of person he is qualifies him for the death penalty."[116]

■ In the second comment to which Walker objected at trial, the prosecutor stated that Donnie's last words to his mother "will surely go with her to her grave."[117] Clearly, this comment was calculated to evoke jury sympathy and was therefore improper.[118]

110. See 2503(A)(4) ("A communication is 'confidential' if not intended to be disclosed to third persons, ...."). Compare Snow v. State, 744 P.2d 980, 981 (Okl.Cr.1987). See also Chandler v. Denton, 741 P.2d 855, 865–66 (Okl.Cr.1987) ("The fact that a client communicates with his attorney within the hearing range of third persons and makes no attempt to prevent the communication from being overheard is indicative that the conversation was not intended to be confidential.").

111. Hurt v. State, 303 P.2d 476, 481 (Okl.Cr. 1956).

112. 12 O.S.1981, § 2801(4)(b)(1).

113. See Duvall v. State, 825 P.2d 621, 628 (Okl. Cr.1991); Davis v. State, 753 P.2d 388, 392 (Okl. Cr.1988).

114. Id. at 577.

115. See McCarty v. State, 765 P.2d 1215, 1221 (Okl.Cr.1988).

116. Id.

117. Id. at 561–62.

118. See Pickens, 850 P.2d at 342; Brown, 753 P.2d at 913.

Given the overwhelming evidence supporting the aggravating circumstances alleged in this case, however, these comments did not affect the jury's sentencing decision.[119]

▮ Finally, Walker objected when the prosecutor told the jury he did not want it to feel responsible for Walker's death if it chose to impose the death penalty. Walker claims this comment violated the United States Supreme Court holding in *Caldwell v. Mississippi*.[120] The prosecutor in *Caldwell* told the jury it should not feel responsible for its decision to put the defendant to death, since that decision would be reviewed by an appellate court. The Supreme Court vacated the death sentence, reasoning that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."[121]

In *Pickens*,[122] we addressed a contention similar to Walker's and found no violation of *Caldwell*. As in *Pickens*, the prosecutor's remark in the instant case—taken in isolation—appears improper. However, it is clear that the prosecutor was responding to defense counsel's closing remarks which included comments such as, now is the time to decide "whether or not the killing stops"[123] and "I am the only person that is now standing between [Walker] and death, . . . ."[124] Further, on the heels of the remark at issue the prosecutor emphasized to the members of the jury that it was their responsibility to decide whether Walker's acts and history warranted imposition of the death penalty. The prosecutor was not attempting to mislead the jury or minimize its role in assessing the death penalty, and his comments did not have that effect.

▮ In proposition nineteen, Walker argues that the trial court's instructions on mitigating circumstances violated the Eighth and Fourteenth Amendments because they permitted jurors to ignore his mitigating evidence. First, instruction number nine, which was verbatim OUJI–CR 438, provided that "[m]itigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame."[125] Walker claims that the phrase "may be considered" was permissive and thus allowed the jury to ignore the mitigating factors. Secondly, in instruction number ten, the trial court told the jury "[y]ou shall consider any or all of these minimum mitigating circumstances which you find apply to the facts and circumstances of this case."[126] Walker claims this instruction violated the Eighth Amendment because it told the jury it could refuse to consider relevant mitigating circumstances.

We rejected this very attack on these two standard, capital sentencing phase instructions in *Pickens*.[127] Walker has not provided this Court any new basis upon which to invalidate these instructions. This proposition is denied.

▮ Walker claims in proposition twenty that the jury instructions describing the manner in which the aggravating and mitigating circumstances were to be weighed set forth an improper burden of proof. The trial court instructed the jury as follows:

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed.[128]

119. *Duvall,* 825 P.2d at 629.

120. 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

121. *Id.* at 328–29, 105 S.Ct. at 2639.

122. 850 P.2d at 343.

123. *Id.* at 565.

124. *Id.* at 566.

125. O.R. 234.

126. *Id.* at 235. *See also* OUJI–CR 438 and 439.

127. 850 P.2d at 339.

128. *Id.* at 237.

Walker attacks this instruction, which was verbatim OUJI–CR 440, on the basis that its "preponderance of the evidence" standard does not honor the heightened need for reliability in capital cases. He argues that Oklahoma juries should have to find that aggravation evidence outweighs mitigation evidence *beyond a reasonable doubt* before they can impose the death penalty.

We have consistently held that "specific standards for the balancing of aggravating and mitigating circumstances are not constitutionally required."[129] Although the State must prove beyond a reasonable doubt the existence of at least one of the statutory aggravating circumstances, it is not required to prove beyond a reasonable doubt that the aggravators alleged outweigh the mitigating factors presented.[130] This proposition is without merit.

In his twenty-first proposition, Walker argues the trial court should have instructed the jury that regardless of its findings on aggravating and mitigating evidence, it had the option of returning a life sentence. This argument advocating Walker's requested instruction on "jury nullification" has been raised and rejected by this Court.[131] This proposition is denied.

Walker asserts in his twenty-second proposition that the trial court erred in failing to instruct the jury on the presumption of life. He claims the judge should have instructed the jury that he was guaranteed the right to a sentence of life imprisonment unless the State proved beyond a reasonable doubt that death was the only appropriate punishment. Walker did not request such an instruction and has thus waived all but plain error.

Regardless of this waiver, this Court has consistently held that capital defendants are not entitled to a "presumption of life" instruction.[132] The trial court's second stage instructions set forth those standards and burdens of proof which are constitutionally mandated. This proposition is denied.

## MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1985, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of an aggravating circumstance as enumerated in 21 O.S.1981, § 701.12. After reviewing the entire appeal record and giving careful consideration to Walker's propositions of error, we find that the sentence of death was not the product of passion, prejudice or other arbitrary factor. We further find that both law and evidence support the jury's determination that the two murders at issue were heinous, atrocious and cruel, that Walker knowingly created a great risk of death to more than one person when he committed the murders, and that Walker poses a continuing threat to society.

## DECISION

Finding no basis for reversal or modification, the judgment and sentence is **AFFIRMED.**

LUMPKIN, P.J., JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., concur.

129. *Thomas v. State,* 811 P.2d 1337, 1351 (Okl. Cr.1991) (citations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992).

130. *See Trice,* 853 P.2d at 215.

131. *See Pickens,* 850 P.2d at 339.

132. *See Duvall,* 825 P.2d at 633–34. *See also Boyd,* 839 P.2d at 1372.