992 P.2d 383 (2000)
2000 OK CR 1
James Patrick MALICOAT, Appellant,
v.
STATE of Oklahoma, Appellee.
No. F-98-151.
Court of Criminal Appeals of Oklahoma.
January 7, 2000.
Rehearing Denied February 8, 2000.
Kindanne C. Jones, Oklahoma City, Oklahoma, Michael Wilson, Capital Trial Division Indigent Defense System, Norman, Oklahoma, Attorneys for Defendant at trial.
Robert E. Christian, District Attorney, Bret T. Burns, Assistant District Attorney, Grady County Courthouse, Chickasha, Oklahoma, Attorneys for the State at trial.
Julie L. Gardner, Jamie D. Pybas, Capital Direct Appeals Division, Norman, Oklahoma, Attorneys for Appellant on appeal.
W.A. Drew Edmondson, Attorney General Of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, Oklahoma, Attorneys for Appellee on appeal.

*391 OPINION

CHAPEL, Judge:
¶ 1 James Patrick Malicoat was tried by jury and convicted of First Degree Murder in violation of 21 O.S.1991, § 701.7(C), in the District Court of Grady County, Case No. CF-97-59.[1] The jury found two aggravating circumstances: (1) that the murder was especially *392 heinous, atrocious or cruel, and (2) the existence of a probability that Malicoat would commit criminal acts of violence constituting a continuing threat to society. In accordance with the jury's recommendation the Honorable Joe Enos sentenced Malicoat to death.
¶ 2 At about 8:25 p.m. on February 21, 1997, Malicoat and his girlfriend, Mary Ann Leadford, brought their thirteen-month-old daughter, Tessa Leadford, to the county hospital emergency room. Staff there determined Tessa had been dead for several hours. The child's face and body were covered in bruises, there was a large mushy closed wound on her forehead, and she had three human bite marks on her body. Tessa had two subdural hematomas from the head injury, and severe internal injuries including broken ribs, internal bruising and bleeding, and a torn mesentery. After an autopsy the medical examiner concluded the death was caused by a combination of the head injury and internal bleeding from the abdominal injuries.
¶ 3 Tessa and Leadford began living with Malicoat on February 2, 1997. Malicoat, who was severely abused as a child, admitted he routinely poked Tessa hard in the chest area and occasionally bit her both as discipline and in play. Malicoat worked a night shift on an oil rig and cared for Tessa during the day while her mother worked. Malicoat initially denied knowing how Tessa got her severe head injury; he later suggested she had fallen and hit the edge of the waterbed frame, then admitted he hit her head on the bed frame one or two days before she died. Malicoat admitted punching Tessa twice in the stomach, hard, about 12:30 p.m. on February 21, while Leadford was at work. Tessa stopped breathing and he gave her CPR; when she began breathing again, he gave her a bottle and went to sleep next to her on the bed. When he awoke around 5:30 p.m., she was dead. He put Tessa in her crib and covered her with a blanket, then spoke briefly with Leadford and went back to sleep in the living room. Leadford eventually discovered Tessa and they brought her to the emergency room. Malicoat explained he had worked all night, had car trouble, took Leadford to work, and was exhausted. He hit Tessa when she would not lie down so he could sleep. He said he sometimes intended to hurt Tessa when he disciplined her, but never meant to kill her. His defense was lack of intent; he claimed he had suffered through such extreme abuse as a child that he did not realize his actions would seriously hurt or kill Tessa.

ISSUES RELATING TO JURY SELECTION
¶ 4 Malicoat complains in Proposition II that he was denied a fair and impartial jury when the trial court passed the jury for cause over objections by the defense. Malicoat's first trial ended in a mistrial after four days of voir dire. The record indicates that officials were not prepared for a death penalty voir dire and all apparently panicked at the lengthy process. This atmosphere was communicated to the jury panel, some of whom expressed resentment toward defense counsel (who were allowed to ask far-reaching questions). All parties appeared very aware of this during the second trial. The trial court conducted an extensive voir dire before allowing the attorneys to question the panel. The court routinely reprimanded both sides for asking questions previously answered in the jury questionnaires, and prevented both sides from asking questions on issues not relevant to any issue in this case. The trial court also routinely stopped both sides from asking the same question of each individual juror when the question could easily be asked of the entire panel. Malicoat complains that he was denied the opportunity to fully voir dire the jury panel on child abuse because the trial court (1) did not allow individual voir dire on that issue, and (2) directed that non-capital group voir dire be finished by 5:00 p.m. on the first day of questioning.
¶ 5 On the contrary, the record reveals the trial court was appropriately exercising its discretion to expedite the proceedings.[2] *393 The trial court initially asked the entire jury panel general questions about child abuse, and did not prevent counsel from asking any particular question on that issue. Malicoat incorrectly complains he was prohibited from asking jurors whether a person's history of child abuse would have a bearing on their decision. The trial court merely told counsel to ask this question of the entire panel collectively and follow up particular responses if warranted, rather than repeating it in general voir dire with each individual juror. The trial court's characterization of this tedious process as repetitive was not an abuse of discretion. We note that counsel did not follow the trial court's suggestion and ask this general question of the entire panel. Malicoat lists several jurors whom he claims were never questioned about child abuse at all. The record shows counsel was not prevented from asking any juror a further or different question than those asked by the trial court or contained in the jury questionnaire. We disagree with Malicoat's suggestion that the trial court's limits on questioning prevented the jurors from considering any particular mitigating factors.
¶ 6 The manner and extent of voir dire, as well as the decision to conduct individual voir dire, are within the trial court's discretion.[3] The voir dire process allows attorneys to see when a challenge for cause exists and permit the intelligent use of peremptory challenges.[4] This Court looks not at whether any specific question was allowed but at whether the overall questioning gives the defendant sufficient opportunity to discover grounds to excuse any particular juror.[5] The record shows that, despite the trial court's imposition of a time limit on general voir dire, counsel had the opportunity to determine whether each juror had feelings about or experience with child abuse which would warrant the juror's removal for cause or with a peremptory challenge. Malicoat was not denied a fair and impartial jury and this proposition is denied.
¶ 7 Malicoat argues in Proposition III that the impaneled jury was not impartial and his death sentence must consequently be vacated. Malicoat claims the trial court erred in failing to excuse for cause six jurors who indicated they would automatically impose the death penalty for first degree murder. Malicoat removed five of the jurors with peremptory challenges but was unable to remove the sixth. A careful review of the record shows no error in the court's decisions as to prospective jurors Davis, Smiley, Davidson and Ladd. Each of these jurors initially indicated either that a person who intentionally killed someone deserved the same, or that the age of the victim in this case would incline them to the death penalty. However, on further questioning each juror stated he or she could consider all three punishments equally. That is all the law requires.[6] Juror Wyatt appeared confused by a defense question regarding who had the burden to "prove" Malicoat should receive the death penalty in second stage. The record does not support Malicoat's claim that Wyatt's view showed an unalterable position. Wyatt stated she did not lean towards any particular punishment and said she could follow the law; the trial court did not err in failing to excuse her for cause. None of these jurors' answers indicated their views would prevent or substantially impair the performance of their duties in accordance with the instructions and their oath.[7]
*394 ¶ 8 However, as the trial court noted, prospective juror Berkshire gave "conflicting answers on just about every point." Berkshire said she leaned toward the death penalty but could consider other options, and that her inclination would interfere with her ability to fairly consider all three options. These answers were ambiguous. Jurors who would automatically vote for or against the death penalty cannot fulfill their oaths because they will fail to consider all the evidence presented.[8] The trial court had the opportunity to view Berkshire and determined her ambiguous response did not indicate her views would substantially impair her ability to sit as a juror. We will not substitute our judgment for the trial court,[9] and find no error in the decision not to remove Berkshire for cause. This proposition is denied.

ISSUES RELATING TO FIRST STAGE PROCEEDINGS
¶ 9 In Proposition I Malicoat argues his Sixth and Fourteenth Amendment rights were violated when the trial court forced defense counsel to reserve opening statement until the State had presented its entire case. During a pretrial hearing the trial court announced the order of trial: the State would open its case and offer evidence in support, then Malicoat would be allowed to open his case and present evidence. The trial court denied Malicoat's objection, but promised to reconsider the order before trial began. On the first day of trial the court again overruled Malicoat's objection and Malicoat was not allowed to give an opening statement until after the State rested its case-in-chief. At that time Malicoat rested without making an opening statement or offering evidence. Counsel stated the defense had made the strategic decision to rest because they were afraid that after hearing the State's graphic evidence the jury would be angered if Malicoat tried to put on a defense. Counsel noted that, had the defense made an opening statement before the State's case, they could have prepared the jury for their defense as elicited through cross-examination of State witnesses. Malicoat now repeats his trial claim that he was prejudiced because he could not (1) explain to the jury what he intended to show through State witnesses or (2) prepare the jury, through opening statement, for his interpretation of the State's evidence.
¶ 10 The trial court relied on 22 O.S.1991, § 831, which directs that, after the jury is sworn the district attorney must read the indictment or Information, open the State's case and offer evidence, after which the defense may open its case and offer evidence. We have held the order of trial is within the trial court's discretion, and it is not reversible error to refuse to allow the defendant to open his case before the State's case-in-chief.[10] In urging us to disregard these cases Malicoat cites cases in which counsel was restricted in strategic decisions concerning when or whether to call defense witnesses, including the defendant.[11] We reject this analogy. Neither Section 831 nor the trial court burdened counsel's strategic decisions concerning testimony. Opening *395 statements are intended to show the jury what the parties intend to present and expect the evidence to prove, and to prepare jurors' minds for the evidence that will be presented.[12] We will not join Malicoat's speculation that, in the absence of an opening statement, jurors were unable to understand or grasp the import of counsel's cross-examination of State witnesses. The trial court did not abuse its discretion in postponing Malicoat's opening statement and this proposition is denied.
¶ 11 In Proposition VI Malicoat claims Dr. Courtnay's opinion that Tessa suffered "intentional abuse" improperly invaded the province of the jury. Dr. Courtnay was the physician who examined Tessa's body at the emergency room. He described the body's appearance and the extent of the visible injuries. Over Malicoat's objection he gave his opinion that Tessa's injuries were consistent with intentional abuse rather than accident. We have held that, unless a defendant raises a cognizable defense such as voluntary intoxication or insanity, an expert should not offer an opinion on whether the defendant's actions were intentional.[13] Any error in admitting this testimony was harmless. We recently held that child abuse murder is a general intent crime.[14] Thus, any opinion regarding Malicoat's intent is irrelevant. This proposition is denied.
¶ 12 Malicoat claims in Proposition VIII that the trial court erred in failing to instruct the jury on the lesser included offense of second degree murder. The trial court denied Malicoat's repeated requests for an instruction on second degree depraved mind murder.[15] Malicoat argues this decision was error because (1) second degree depraved mind murder is a lesser included offense of child abuse murder, and (2) he is in any case entitled under settled law to instruction on any degree of homicide supported by the evidence. The State responds that this Court has recently held second degree depraved mind murder is not a lesser included offense of malice murder,[16] and should extend those rulings to child abuse murder. We find this unnecessary.[17]
¶ 13 Evidence did not support an instruction on depraved mind murder. Malicoat claims the evidence showed Tessa's death was the result of an "impulsive outburst of rage" brought on by lack of sleep, stress, and conditioned behavior learned through a cycle of abuse. However, that evidence was presented in second stage. *396 First stage evidence showed Malicoat told officers he did not intend to kill Tessa. However, he admitted biting her in play and anger, hitting her head on the bed rail, and punching her twice in the stomach while she screamed in pain. Medical evidence showed these injuries, especially the head and abdominal injuries, would have been very painful with obvious physical symptoms. Malicoat said Tessa had trouble eating after the head injury and he thought of taking her to a doctor, but did not because he was afraid authorities would take her away. Evidence showed Malicoat was exhausted and upset when he punched Tessa in the stomach, but suggested this was part of a pattern of intentional abuse (including the biting and head injury) rather than an impulsive outburst. Taken as a whole, this does not support a lesser included instruction on depraved mind murder. This proposition is denied.
¶ 14 In Proposition X Malicoat claims Oklahoma's child abuse murder statute is void for vagueness. Malicoat concedes this Court held in Drew v. State[18] that the child abuse murder statute is sufficiently clear and explicit for the understanding of ordinary persons. We decline to revisit this ruling here. We reject Malicoat's contention that the statute is vague as applied to him. We agree that persons of ordinary intelligence may disagree on what "ordinary force" and "unreasonable force" mean in the context of child punishment. However, Malicoat's action in punching Tessa twice in the stomach, hard enough to rip open her internal organs, is exactly the sort of extreme case on which all persons of ordinary intelligence agree. The statute afforded Malicoat fair warning of the nature of the proscribed conduct.[19] This proposition is denied.

ISSUES RELATING TO PUNISHMENT
¶ 15 In Proposition XII Malicoat argues the evidence in this case was insufficient to support a sentence of death because the prosecution did not prove that he intended to kill Tessa, intentionally employed lethal force against her, or knowingly engaged in criminal activities known to carry a grave risk of death. In Fairchild[20] this Court held child abuse murder is a general intent crime. Malicoat argues a conviction based on a general intent, or an intent merely to injure, cannot render a defendant death-eligible. He claims that, under the Enmund/Tison[21] formula, to impose the death penalty the jury must find either (1) he intended life be taken or contemplated that lethal force would be used; or (2) he had substantial personal involvement in the underlying felony and exhibited reckless disregard or indifference to the value of human life. The trial court refused Malicoat's requested Enmund/Tison instructions. We found in Fairchild that these instructions are not necessary when the defendant himself "personally, willfully, commits an act which produces an injury upon a child resulting in the death of the child, or uses unreasonable force upon a child resulting in the death of the child."[22] We decline to revisit this finding here. Malicoat admitted hitting Tessa, causing the injuries which resulted in her death. This proposition is denied.[23]
¶ 16 Malicoat argues in Proposition XIII that his death sentence should be vacated because the State relied upon inadmissible, irrelevant and unreliable evidence to support the continuing threat aggravating circumstance. He also argues the remaining evidence was legally insufficient to support this circumstance. For the jury to validly *397 find that the defendant will probably commit criminal acts of violence posing a continuing threat to society, the State must present sufficient evidence of past convictions or unadjudicated crimes to show a pattern of criminal conduct that will likely continue.[24] This Court will uphold the jury's finding if, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could find the charged aggravating circumstance beyond a reasonable doubt.[25] "In other cases in which this Court has found the evidence sufficient to support the continuing threat aggravating circumstance, the State has introduced evidence of prior criminal acts of violence, prior unadjudicated offenses, or evidence of criminal activity occurring after the crime."[26] The most common grounds alleged to prove the continuing threat aggravator include the defendant's history of violent conduct, the facts of the homicide at issue, threats made by the defendant, lack of remorse, attempts to prevent calls for help, mistreatment of family members and testimony of experts.[27] "Any relevant evidence showing the probability that the defendant will commit future acts of violence would support the finding that a defendant will be a continuing threat."[28] To support this circumstance the State relied on the circumstances of the crime and testimony of Toby Malicoat, Malicoat's estranged wife.
¶ 17 Malicoat first complains that Toby Malicoat's testimony was irrelevant, inadmissible and incompetent. Over Malicoat's objection, Toby testified that he did not pay child support, and that he once grabbed her wrist and fractured it during a fight. Toby said shortly before their marriage Malicoat told her he did not like nor want children, and when she became pregnant a month later he said if she did not get rid of the baby that he would when it got here. There was no evidence Malicoat ever harmed that child. Toby said that Malicoat threatened her and her child after he was jailed in this case. Toby's testimony and her interview with a police officer were internally inconsistent and inconsistent with each other. She admitted she said that Malicoat broke her wrist, that he beat her, that he did not beat her but left bruises, and that he never touched her. She did not tell police the story about Malicoat threatening their unborn child. Toby admitted she had bad feelings about Malicoat, because although they never divorced he left her and had a child with another woman.
¶ 18 The contradictions and inconsistencies in Toby Malicoat's testimony do not render it inherently unreliable, but go to the weight of the evidence.[29] The fact Malicoat paid no child support is completely irrelevant to the determination of whether he might commit continuing acts of violence, and should not have been admitted to support this aggravating circumstance. Toby's testimony that Malicoat fractured her wrist constitutes evidence of an unadjudicated crime, and is admissible to show continuing threat. Her testimony about Malicoat's threat to their unborn child, and his threat after being jailed in this case, are relevant to show a pattern of threats of violent conduct made by the defendant. This evidence was properly admitted.[30]
¶ 19 We also disagree with Malicoat's claim that the remaining evidence is insufficient to support this aggravating circumstance. The State relied on (1) Malicoat's brother's opinion that Malicoat was mean enough to have done the crime and liked to beat women; (2) a letter Malicoat wrote a friend, while jailed waiting trial, in *398 which he advised her to tell a third person that he, Malicoat, said to back off or else; (3) evidence that Malicoat had a temper and reacted to situations violently; (4) evidence Malicoat was a danger to children; and (5) the circumstances of the crime, including the intentional nature of the abuse and Malicoat's apparent lack of remorse at the time. Malicoat admits this Court has held the nature of the crime is sufficient to support this aggravating circumstance.[31] This evidence is sufficient to show a pattern of violent criminal conduct likely to continue. This proposition is denied.
¶ 20 Malicoat argues in Proposition XIV that his constitutional rights were violated by the use of inadmissible evidence in support of the especially heinous, atrocious or cruel aggravating circumstance. The especially heinous, atrocious or cruel aggravating circumstance is limited to cases in which the murder was preceded by torture or serious physical abuse.[32] The State must show conscious suffering, and evidence the victim was aware of the attack is sufficient to show torture.[33] We will review the record to see whether any competent evidence supports the jury's finding.[34] To support this aggravating circumstance the State incorporated the first stage evidence.
¶ 21 Malicoat first claims the trial court erred in allowing the medical examiner to testify regarding the pain and suffering Tessa would have experienced as a result of her head and abdominal injuries. Malicoat's repeated objections to this testimony were overruled, and the issue has been preserved for appeal. The medical examiner described the various and extensive internal and external injuries he found on Tessa's body, including injuries to organs with which laypersons are unfamiliar. He said the abdominal injuries were "non-survivable". In his medical opinion, Tessa's symptoms from the injuries would have included brief loss of consciousness, fussy behavior, poor eating, restlessness and eventually sleepiness sliding into a coma. He said the chest injuries would have been quite painful: bruises to the lungs could have caused difficulty breathing, the bruised diaphragm would have made every breath painful, and the broken ribs would have been very painful whenever Tessa breathed or moved. He said the ruptured mesentery and bleeding in the liver and kidneys would have been extremely painful when inflicted, and would have continued to cause cramping and probably a dull aching pain associated with the tearing and gradual loss of blood. This testimony was admissible as expert opinion evidence.[35] The average layperson is unfamiliar or only vaguely familiar with several of the organs injured here. Malicoat vigorously argues elsewhere that a reasonable person could not have known the particular injuries he inflicted would have resulted in Tessa's death. While we reject that argument, we agree that the medical examiner's opinion assisted the jury in determining the effects of the wounds Tessa received. The precise locations and consequences of these injuries are not readily appreciable by any ordinary person without the special skills or knowledge necessary to understand these facts and draw the appropriate conclusions.[36] We disagree with Malicoat's claim that pain is so subjective the medical examiner's opinion amounted to speculation. While the extent to which a particular person feels pain varies, we accept as fact the proposition that certain injuries will cause pain, and that it is possible to determine whether, as a general rule, that pain is more or less severe. This evidence assisted the jury in determining whether Tessa's death was heinous, atrocious or cruel. *399 The trial court did not err in overruling Malicoat's objections and admitting this testimony.
¶ 22 Malicoat also complains of evidence of injuries not contemporaneous with death, including the bites, shoving, pushing and poking. Evidence of biting was relevant because biting was charged in the Information. Evidence Malicoat caused Tessa's head injury by pushing her into the bed rail was relevant because the head injury contributed to her death. Much of the other "evidence" Malicoat complains of was actually contained in the State's closing argument. The trial court did not admit evidence that the abuse continued for nineteen days, although the jury certainly could have inferred that from evidence that was admitted. There was evidence that Malicoat poked Tessa both in anger and at play, and pushed her rather than spanking her, but there was no date given for these incidents. We have held evidence of extreme mental torture occurring before or separate from the events causing death is insufficient to support the heinous, atrocious or cruel aggravating circumstance.[37] However, Malicoat subjected Tessa to a continuing course of conduct, comprising intentional child abuse, which even he agreed could be described as torture. The trial court did not err in admitting this evidence.
¶ 23 The medical examiner testified regarding the extent of pain and suffering Tessa probably experienced as a result of her injuries. Other evidence showed Malicoat engaged in serious physical abuse and torture preceding Tessa's death. Malicoat told officers Tessa was conscious and screamed in pain as he hit her in the stomach, causing non-survivable injuries. Sufficient evidence supports the jury's finding of the heinous, atrocious or cruel aggravating circumstance and this proposition is denied.
¶ 24 Malicoat claims in Proposition XV that the State's reliance upon the same course of conduct to support both his conviction for child abuse murder and the especially heinous, atrocious, or cruel aggravating circumstance does not effectively narrow the class of murders for which the death penalty is appropriate. The State relied on evidence that Malicoat abused Tessa and beat her to death to gain a conviction for child abuse murder. The State introduced the same evidence to support the charge that the murder was especially heinous, atrocious or cruel (see Proposition XIV). Malicoat argues this use of the same evidence to prove guilt and an aggravating circumstance eviscerates the narrowing function necessary before the death penalty may be imposed. In capital cases, the sentencer's discretion must be narrowed by circumscribing the class of death-eligible persons.[38] Malicoat argues that the child abuse murder statute broadens the class of death-eligible homicides by requiring proof of abusive conduct toward a child resulting in death. He claims the proof of torture or serious physical abuse necessary for a murder to be heinous, atrocious or cruel merely duplicates the child abuse requirement of child abuse murder. He suggests that this double use of torture or serious physical abuse is being improperly used to both broaden and narrow the class of death-eligible defendants.
¶ 25 We disagree. Malicoat is incorrect when he claims a conviction for child abuse murder necessarily requires proof of physical abuse or torture. The statute requires only the death of a child resulting from one of several forms of abuse. A defendant may be convicted of child abuse murder although the victim did not consciously suffer before death. As conscious suffering is necessary for a valid finding that a murder is heinous, atrocious or cruel, that aggravating circumstance does not merely duplicate the elements of child abuse murder.[39] Rather, the heinous, atrocious or cruel *400 aggravating circumstance narrows the class of child abuse murders in which defendants are eligible for the death penalty. This proposition is denied.
¶ 26 In Proposition XVI Malicoat claims the trial court's misdefinition of the "especially heinous, atrocious or cruel" aggravating circumstance failed to adequately channel the jury's discretion. Malicoat correctly claims the trial court erred in instructing the jury a finding of "heinous, atrocious or cruel" required "serious abuse" rather than "serious physical abuse". In several recent cases this Court has found this omission to be error not requiring relief under the plain error standard as it does not alter the burden of proof.[40] We will not revisit that determination, but once again urge trial courts to instruct the jury correctly and use the phrase "serious physical abuse". The State argued that Tessa was seriously abused; the evidence, particularly the photographs, clearly showed that the abuse was physical in nature. This proposition is denied.
¶ 27 Malicoat argues in Proposition XVII that the aggravating circumstances in his case fail to narrow the jury's discretion and amount to standardless catch-alls which may be charged in each case. We have repeatedly rejected this claim for both the continuing threat[41] and heinous, atrocious or cruel[42] aggravating circumstances. We refuse the invitation to reconsider these decisions. This proposition is denied.
¶ 28 In Proposition XVIII Malicoat claims the trial court erred in refusing to instruct the jury on the meaning of life imprisonment without the possibility of parole. Malicoat acknowledges we have often held that the phrase is self-explanatory and this instruction is not required.[43] We decline his invitation to reconsider these cases. This proposition is denied.
¶ 29 In Proposition XIX Malicoat claims that mitigating factors outweighed the evidence presented in aggravation and asks this Court to reverse his death sentence. He argues this Court should review the evidence that Malicoat suffered severe and extended emotional and physical abuse as a child, reinforced by a history of abuse in his immediate family, culminating in a learned response pattern that dictated his inappropriate parental responses. The jury was instructed mitigating factors included: Malicoat had no significant history of prior criminal activity; his capacity to appreciate the criminality of his acts or conform his conduct to the law was impaired; he was under the influence of mental or emotional disturbance; he had remorse; he could be rehabilitated; he cooperated with authorities; his age; his emotional and family history, including chronic abuse as a child; and that he had the love and support of his family. We have determined through *401 independent review that the evidence supports the jury's finding of aggravating circumstances.[44] We find no error and will not substitute our own findings for the jury's.[45] In the mandatory sentence review we determine Malicoat's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. This proposition is denied.

ISSUES RELATING TO BOTH STAGES
¶ 30 In Proposition IV Malicoat claims the prosecutor engaged in improper closing argument in first and second stage. "Both parties have wide latitude in closing arguments to discuss the evidence and reasonable inferences, and this Court will grant relief only where grossly improper and unwarranted argument affects the defendant's rights."[46] Most of the comments were not met with objection and are reviewed for plain error only. Although certain comments were error, and others approached the limits of impermissible argument, we cannot say that the arguments taken as a whole deprived Malicoat of a substantial right or went to the foundation of his defense.[47] This proposition is denied.
¶ 31 Malicoat first complains of the first stage closing argument in which the prosecutor delivered a two-page first-person account of Tessa Leadford's final hours. He made timely objection to this argument, preserving the issue for trial. While theatrical, we do not find this argument overly prejudicial. The prosecutor occasionally speculated as to Tessa's feelings and thoughts. The argument very nearly constitutes an improper solicitation of sympathy for the victim, but is largely based on the evidence presented.[48] The medical examiner testified as to the type and severity of pain probably caused by Tessa's injuries and several witnesses testified about Malicoat's account of Tessa's abdominal injuries and death, including her screams of pain. Taken as a whole, the argument does not manipulate or misstate the evidence and we find no error.[49]
¶ 32 Malicoat complains of several comments made during the second-stage closing. He first argues the prosecutor erred in a lengthy section in which he described Malicoat as a monster and called him evil. This Court has repeatedly looked with disfavor on this sort of name-calling and stated prosecutors should refrain from airing their personal opinions.[50] The State argues the "monster" references were in reply to defense counsel's closing argument question of whether monsters are born or created. While defense counsel used the word, the State's repeated use of the term as applied to Malicoat went beyond anything counsel may have invited. However, the comments do not constitute plain error.
¶ 33 Malicoat claims the prosecutor demeaned his mitigating evidence and misstated the law when he compared Malicoat's mitigating evidence to "excuses", suggested Malicoat was just blaming his family and saying his crime was everybody's fault, asked when Malicoat would accept responsibility for his acts, and told the jury to weigh Malicoat's excuses against his actions. When the jury is properly instructed on mitigating evidence, it is not improper for the State to comment negatively on that evidence.[51] The State's characterization of Malicoat's mitigating *402 evidence as an attempt to blame his family for the cycle of child abuse, which resulted in Tessa's death, is a reasonable inference from the evidence. The prosecutor did not encourage the jury to disregard Malicoat's mitigating evidence and we find no error.
¶ 34 Malicoat correctly argues the State attempted to elicit sympathy for the victim, and gave a personal opinion of his guilt and appropriate punishment. The State argued facts not in evidence, saying Tessa got her name from a (television) angel, and arguing that the family was present for Malicoat but the jury was there for Tessa. The State should refrain from eliciting sympathy for the victim, arguing facts not in evidence, and identifying the jury with the victim.[52] The State also (1) asked what justified the imposition of the death penalty more than the torture of a 13-month-old; (2) said several times Malicoat deserved the harshest possible punishment and nothing less; (3) the only just verdict was a death penalty; and (4) "we" needed the jury to give the death penalty for our system, for justice to Malicoat, and for Tessa. This Court has repeatedly warned prosecutors not to engage in these specific arguments or express personal opinions about the appropriateness of the death penalty.[53] However, these "improper and reprehensible" comments did not deprive Malicoat of a substantial right or go to the foundation of his defense.[54]
¶ 35 In Proposition V Malicoat argues the trial court erred by permitting the State to introduce evidence of other crimes. Malicoat was charged by Information with the child abuse murder of Tessa Leadford on February 21, 1997, specifically stating Malicoat "did physically abuse, strike and bite" the victim. Malicoat filed a Motion in Limine restricting the State from offering evidence of any other abuse than that causing death (the major head and abdominal injuries). Both parties admitted the State failed to file any Burks notice on the evidence of other child abuse. The trial court sustained this motion in part, ruling the State could only offer evidence of other injuries that were caused at the same time and as part of the injuries causing death.[55] Thus, the poking in the chest, miscellaneous bruises and biting were initially ruled inadmissible. In accordance with this ruling the State did not read aloud the part of the Information referring to bite marks in opening statement. The trial court sustained most of Malicoat's objections to pictures and testimony showing evidence of crimes through most of the State's case-in-chief. During one of several in camera hearings on the issue, well into the State's case, the trial court noticed that biting was charged in the Information. Based on this, the trial court ruled that, despite lack of a Burks notice, Malicoat could not claim surprise on this evidence and it would be admitted. The trial court reaffirmed its ruling regarding the injuries other than biting. Thereafter the trial court allowed limited testimony that Malicoat told officers he poked Tessa, and allowed pictures showing bites, bruises from poking, an abrasion to her nose, and a scratch as well as the more serious injuries. The trial court sustained Malicoat's objection to evidence he had abused Tessa since she moved in.
¶ 36 Malicoat first complains the trial court erred in ruling he was not surprised although no Burks notice was filed. The trial court relied on Wisdom v. State,[56] in which we held the purpose of the Burks notice requirement is to ensure against surprise and allow time for the defendant to be *403 heard regarding the other crimes evidence before it goes to the jury. This ruling was not error. Malicoat could not have been surprised by the evidence of biting, since it was charged in the Information. He obviously had the opportunity to be heard on all the other crimes evidence as his motion in limine was sustained in part and several hearings and bench conferences on the issue were held throughout trial. The trial court sustained the objection to evidence of other crimes which were not themselves significant factors in Tessa's death or intertwined with those acts. Malicoat complains that the trial court found only constructive notice under Wisdom without considering the other Burks factors. However, at trial he moved to restrict this evidence on notice grounds and, in second stage, on the grounds this evidence would be improper to support the charged aggravating circumstances. The trial court's ruling conformed to the scope of Malicoat's objection. This offers no reason for us to reconsider Wisdom, as this case says nothing about how Wisdom is applied in conjunction with other Burks issues not raised below.
¶ 37 Both parties waste effort arguing that the other crimes evidence was or was not admissible as part of the res gestae.[57] Evidence showed the incidents of poking, scratching and biting were separate and distinct from the acts of violence which led to Tessa's death. Based on this, the trial court correctly ruled those other crimes were not part of the res gestae of the crime, since they neither contributed to Tessa's death nor were intertwined with acts that did.[58]
¶ 38 The trial court did not err in admitting evidence of biting. The trial court did allow an isolated statement about poking, as well as pictures which incidentally showed a scratch, chest bruises and injury to Tessa's nose as well as the major injuries charged. We are satisfied beyond a reasonable doubt that any error in admitting this evidence did not contribute to Malicoat's conviction or sentence of death.[59] Malicoat admitted engaging in the conduct which resulted in Tessa's death, and the medical evidence showed the nature and extent of her injuries. The jury could have disregarded the improper other crimes evidence and convicted Malicoat of child abuse murder. Similarly, sufficient proper evidence was presented in aggravation to support the jury's finding of death absent any references to improper evidence of other crimes. This proposition is denied.
¶ 39 Malicoat claims in Proposition VII that the trial court erroneously admitted irrelevant and prejudicial evidence in the first and second stages of trial. Relevant evidence tends to make the existence of any fact that is of consequence to the determination of the case more or less probable.[60] Relevant evidence is admissible, but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, or if it confuses the issues, misleads the jury, causes delay or needless presentation of cumulative evidence, or results in unfair and harmful surprise.[61] A thorough review of Malicoat's claims shows no error in the first stage evidence, and we conclude error in the second stage did not determine the outcome of the case. This proposition is denied.
¶ 40 Malicoat begins Proposition VII by alleging several errors during the first stage of trial. The State attempted to introduce evidence that Malicoat's house was filthy, smelled bad, and had dog feces on the floor and furniture. The trial court initially sustained Malicoat's objections to this evidence, noting this was not a neglect case and evidence of poor housekeeping had no causal connection to Tessa's death. On cross-examination defense counsel asked a police officer *404 whether Malicoat hadn't emphasized his sense of responsibility for taking care of Tessa. The trial court ruled the question of responsibility for the child's care opened the door to the house's condition, and overruled Malicoat's objection to a subsequent question about the state of the house. This was not clearly an abuse of discretion. While the evidence of poor housekeeping was not relevant to the charged offense it was relevant to the suggestion Malicoat accepted his parental responsibilities.
¶ 41 Malicoat complains about evidence that he had a bad temper, along with a picture of a hole he punched in the wall of his bedroom. The evidence shows Malicoat told officers he had a bad temper but tried to keep it under control around Tessa, and knew it was getting the better of him in the week before her death. Malicoat's mother testified that, during a visit shortly before Tessa's death, Tessa clung to her and did not want to go to Malicoat. She also saw Tessa back away when Malicoat tried to feed her. Malicoat's mother said these actions caused her to believe Tessa was afraid of Malicoat. This evidence was within the witness's personal knowledge,[62] and rationally based on her perceptions of the events she saw.[63] However, all this evidence could only be relevant to show whether Malicoat intended to commit child abuse. As child abuse is a general intent crime, this was irrelevant for this issue and should have been excluded.[64] However, we find admission of this evidence did not contribute to Malicoat's conviction or sentence.
¶ 42 Finally, Malicoat complains in first stage about the medical examiner's testimony regarding the probable extent of pain and suffering Tessa experienced as a result of her injuries. Pain is relevant to the jury's determination of use of unreasonable force.
¶ 43 Malicoat also complains in Proposition VII about evidence introduced during the punishment phase. As in the first stage, the trial court allowed a picture of Malicoat's unkempt house to counter his claim that he loved and cared for Tessa. The court also allowed the State to question Malicoat's mother about the condition of the house. The State questioned his mother about, but did not introduce, a picture of a poorly-stocked refrigerator which had no food appropriate for a 13-month-old. She testified Malicoat and Leadford did not have baby food and told her to mind her own business when she gave them advice on how to feed Tessa. Admission of this evidence was not clearly an abuse of discretion. It rebutted the defense characterization of Malicoat as a loving and concerned father.
¶ 44 Over Malicoat's objection the State introduced a photograph of Tessa taken two months before her death. Photographs of live victims are generally inadmissible, as they are irrelevant to any issues at trial.[65] This picture was irrelevant and should not have been admitted, and the State's use of it in closing argument compounded the error. However, we conclude beyond a reasonable doubt that admission of this picture did not contribute to Malicoat's death sentence.
¶ 45 Malicoat finally complains about two categories of improper evidence. Toby Malicoat was allowed to state that Malicoat failed to pay child support. This was irrelevant to any second stage issue and could only serve to prejudice Malicoat further in the eyes of the jurors. However, this isolated comment did not unduly prejudice Malicoat given the other evidence presented in aggravation. The State asked two successive questions to elicit a witness's opinion on whether Malicoat intentionally abused Tessa. The witness, an experienced investigator, answered "yes" both times before the trial court ruled on Malicoat's objections. This apparent example of bad-faith questioning did not determine the verdict. The trial *405 court sustained each objection, and admonished the jury once, curing the error.[66]
¶ 46 In Proposition IX Malicoat claims the trial court erred in admitting photographs of the victim. Malicoat objected to the admission in first stage of four photographs of Tessa taken at the emergency room. The trial court ruled at a motions hearing and again at trial that the photos were more probative than prejudicial. "Photographs of a corpse may be admissible, among other reasons, to show the nature, extent and location of wounds, to show the crime scene, or to corroborate the medical examiner's testimony."[67] The admission of photographs is within the trial court's discretion.[68] The photographs corroborate the medical testimony and show the nature, extent and location of Tessa's wounds. The photographs aided the jury in determining whether to believe Malicoat's claim that he did not realize he was inflicting serious and potentially deadly injuries. The trial court did not abuse its discretion in admitting these pictures.
¶ 47 Malicoat also claims the State improperly used the photographs during second stage closing argument. The prosecutor held up a photograph of Tessa while alive and compared it with the four post-mortem photos. We have already determined it was error to use the picture of Tessa while alive, and found that error requires no relief (see Proposition VII). However, the use of photos of Tessa's corpse was within the bounds of permissible argument. We find no error. This proposition is denied.
¶ 48 Malicoat claims in Proposition XI that he was denied effective assistance of counsel. In order to show ineffective assistance, Malicoat must show that counsel's performance was so deficient he did not have counsel as guaranteed by the Sixth Amendment, and his defense was prejudiced as a result of counsel's deficient performance by errors so serious as to deprive him of a fair trial with reliable results.[69] There must be a reasonable probability that, absent errors, the sentencer would conclude the balance of aggravating and mitigating circumstances did not support a sentence of death.[70] Counsel must act as an advocate and subject the State's case to adversarial testing.[71] Malicoat must overcome the strong presumption that counsel's conduct fell within a wide range of reasonable professional assistance and equaled sound trial strategy.[72] This Court will consider whether, viewing counsel's challenged conduct on the facts of the case as seen at the time, it was professionally unreasonable; if so, we will ask whether the error affected the jury's judgment.[73] The question is not whether the outcome would have been different absent counsel's actions, but whether the result of the proceeding was fundamentally unfair or unreliable.[74]
¶ 49 Malicoat first argues counsel was ineffective for failing to present a defense. Counsel neither made an opening statement nor presented evidence in the first stage of trial, but conducted vigorous cross-examination of State witnesses. In Proposition I we rejected Malicoat's claim that the trial court's announced order of trial induced ineffective assistance of counsel. We also reject his claim that counsel was ineffective for failing to give an opening statement and present evidence. On the record, counsel described the strategic decision to refrain from offering a defense after hearing the *406 State's evidence. We will not second-guess this apparently sound strategic decision.[75] The record shows counsel had intended to present an expert witness who would testify that Malicoat's history of abuse altered his perception of his own actions, and that he did not intend to injure or kill Tessa. The trial court had not ruled on whether this evidence would be admitted in first stage. As child abuse murder is a general intent crime, this evidence would be irrelevant to any first stage issue, and counsel cannot be ineffective for failing to present it.[76]
¶ 50 Malicoat argues that counsel failed to investigate his medical history and effectively prepare his medical expert. Appellate counsel asserts trial counsel should have discovered Malicoat's history of seizures. Counsel claims that this information would have changed the medical expert's diagnosis and potential first stage testimony. He argues this information could have been used in support of an instruction on second degree depraved mind murder. We have determined Malicoat was not entitled to an instruction on second degree murder. In addition, general information that Malicoat had suffered from seizures would not have entitled him to that instruction without some evidence that he suffered from a seizure while committing the acts of child abuse which resulted in Tessa's death. As Malicoat was not entitled to an instruction on second degree murder, he cannot show he was prejudiced by counsel's failure to use this information in first stage. Similarly, we find no prejudice in the absence of this information during second stage. We cannot agree with Malicoat's claim that counsel failed to present significant mitigating evidence. On the contrary, counsel presented a thorough and comprehensive picture of Malicoat's personal and family history, concentrating on his experience of severe abuse and resulting personality transformation. Appellate counsel has not shown the addition of evidence Malicoat suffered from seizures would have led the jury to conclude the balance of aggravating circumstances and mitigating factors did not support death.
¶ 51 Malicoat finally complains counsel was ineffective for failure to object to instances of prosecutorial misconduct. We determined in Proposition IV that some comments constituted error, but did not go to the foundation of Malicoat's case or take from him a substantial right. Failure to object to improper but nonprejudicial tactics does not amount to ineffective assistance.[77]
¶ 52 In summary, we will not second-guess counsel's strategic decision regarding first-stage evidence. We find Malicoat was not prejudiced by counsel's failure to find or use information regarding his past history of seizures. Counsel was not ineffective for failing to object to errors in the State's argument. This proposition is denied.[78]
¶ 53 Finally, in Proposition XX Malicoat claims he is entitled to relief due to the accumulation of error in the case. Malicoat has raised no issue which individually or in accumulation requires relief. We have determined that any individual errors were either cured or did not affect a substantial right or go to the foundation of Malicoat's defense. There is no cumulative error,[79] and this proposition is denied.

MANDATORY SENTENCE REVIEW
¶ 54 In accordance with 21 O.S. 1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of *407 the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C).
¶ 55 The jury was instructed on and found the existence of two aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel, and (2) the existence of a probability that Malicoat would commit criminal acts of violence constituting a continuing threat to society. Malicoat presented evidence that he did not intend the victim's death, and that he suffered severe and extended emotional and physical abuse as a child. The jury was instructed on nine mitigating factors (see Proposition XIX). Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.
¶ 56 Finding no error warranting modification, the judgment and sentence of the District Court of Grady County is AFFIRMED.
JOHNSON, J.: concurs.
LUMPKIN, V.P.J., and LILE, J.: concur in results.
STRUBHAR, P.J.: dissents.
STRUBHAR, Presiding Judge, Dissenting:
¶ 1 In the recent case of Fairchild v. State, 1999 OK CR 49, ¶¶ 28 & 51, 992 P.2d 350 (opinion on rehearing), this Court chose to disregard established precedent and hold that child abuse and child abuse murder are general intent crimes requiring nothing more than a purpose or willingness to commit the act of abuse. Additionally, the Fairchild court erroneously concluded that a general intent crime is death eligible without any culpability instructions or assessment. Fairchild, 1999 OK CR 49, at ¶ 100, 992 P.2d 350. Inasmuch as the majority relies on these Fairchild holdings to dispose of the claims raised in the instant appeal, I must dissent. Consequently, I remain steadfast in my opinion that the specific intent to injure is an element of child abuse murder including child abuse murder committed by the willful use of unreasonable force. See Fairchild v. State, 1998 OK CR 47, 965 P.2d 391, 403 (Lane, J. dissenting joined by Strubhar, V.P.J.) (opinion withdrawn, 1999 OK CR 30, 992 P.2d 349, 1999 WL 604317 (1999)). See also Grady v. State, 1997 OK CR 67, 947 P.2d 1069; Bannister v. State, 1996 OK CR 60, 930 P.2d 1176; Hockersmith v. State, 1996 OK CR 51, 926 P.2d 793. I further believe a culpability assessment is required to maintain the constitutional validity of child abuse murder as a capital offense. As I stated on rehearing in Fairchild:
the better solution is to follow our established precedent holding child abuse murder is a specific intent crime and avoid the culpability problem altogether. Barring the return to our prior holdings that child abuse murder is a specific intent crime, child abuse murder under 21 O.S.1991, § 701.7(C) can pass constitutional muster as a capital offense only if it is combined with our statutory aggravating circumstances (none of which concern the defendant's culpability for the murder) and the culpability requirements of Enmund/Tison.[[1]] Combining these factors in assessing punishment reasonably justifies the imposition of the more severe sentence of death on the defendant vis a vis others found guilty of murder thereby satisfying Zant.[[2]]
Fairchild, 1999 OK CR 49, at ¶ 10, 992 P.2d 350 (Strubhar, P.J., dissenting).
¶ 2 As the majority relies on the erroneous holdings of Fairchild, I dissent.
LUMPKIN, Vice-Presiding Judge: Concur in Results.
¶ 1 I concur with the Court's decision to affirm the conviction and death sentence in this case, however, I write separately to address the following issues.
¶ 2 In Proposition VI addressing expert witness testimony, the scope of expert testimony *408 is limited as set forth in White v. State, 973 P.2d 306, 314-15 (Okl.Cr.1998) (Lumpkin, J. specially concur). Further, Dr. Courtnay's opinion testimony went to the cause of the victim's injuries, not Appellant's guilt or innocence. Therefore, no error occurred. Revilla v. State, 877 P.2d 1143, 1150 (Okl.Cr. 1994), cert. denied, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995).
¶ 3 In Proposition XII, an Enmund/Tison analysis does not apply to Appellant's case as he was the actual perpetrator and the findings in Enmund and Tison concerned non-triggerman co-defendants. This is a significant distinction which renders the death qualifying language of Enmund and Tison inapplicable. See Wisdom v. State, 918 P.2d 384, 395 (Okl.Cr.1996). This finding is consistent with Cabana v. Bullock, 474 U.S. 376, 386, 106 S.Ct. 689, 697, 88 L.Ed.2d 704, 716 (1986), wherein the Supreme Court stated the Eighth Amendment is not violated by the execution of a person who "in fact killed, attempted to kill, or intended to kill." Id. The Oklahoma Constitution does not impose a higher standard than the Federal Constitution regarding the holdings of Enmund or Tison.
¶ 4 Addressing the sufficiency of the evidence to support the aggravator "especially heinous, atrocious or cruel" in Proposition XIV, this Court has found the mental torture experienced by the victim prior to the murder sufficient to support the aggravator. Hawkins v. State, 891 P.2d 586, 597 (Okl.Cr. 1995); Revilla, 877 P.2d at 1155. In reviewing the evidence offered in support of this aggravator, we look for proof that the death was preceded by torture or serious physical abuse. Revilla, 877 P.2d at 1155. This includes evidence which shows the infliction of either great physical anguish or extreme mental cruelty. Hain v. State, 919 P.2d 1130, 1146 (Okl.Cr.), cert. denied, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996). In the present case, the mental anguish experienced by the victim as a result of Appellant's repeated instances of abuse constituted extreme mental cruelty and is sufficient to support the mental torture aspect of the aggravator.
¶ 5 Finally, in footnote 78 the Court summarily denies the Application for Evidentiary Hearing on Sixth Amendment Grounds. In the application Appellant asserts that counsel was ineffective for not adequately developing and presenting Appellant's mental health history by failing to present: 1) testimony from Dr. Murphy at either stage of trial; 2) testimony from family members with knowledge of Appellant's history of seizures; and 3) testimony from Dr. Hopewell that Appellant suffered from organic brain damage. Appellant also argued trial counsel was ineffective in failing to: 1) present witnesses to rebut the continuing threat aggravator; 2) rebut the testimony of Toby Malicoat; 3) present witnesses showing that Appellant would not be a continuing threat in prison; and 4) present other mitigating witnesses.
¶ 6 Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (1998) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence... which could have been made available during the course of trial." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i). While Appellant has provided a great deal of information in the affidavits accompanying his application, he has failed to set forth sufficient evidence to warrant an evidentiary hearing. He has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify the complained-of evidence. While Appellant may have a history of seizures, the record is void of any evidence that his actions were caused by or related to a seizure. Accordingly, I would decline to grant Appellant's application for an evidentiary hearing.
¶ 7 I am authorized to state that Judge Lile joins in this concur in result.
NOTES
[1] Malicoat was tried in January 1998. His first trial, in September 1997, ended in a mistrial after four days of voir dire examination.
[2] Jackson v. State, 1998 OK CR 39, 964 P.2d 875, 883, cert. denied, 526 U.S. 1008, 119 S.Ct. 1150, 143 L.Ed.2d 217 (1999). We have affirmed the importance of trial courts' discretion in use of time management techniques and jury questionnaires in Cohee v. State, 1997 OK CR 30, 942 P.2d 211.
[3] Cheney v. State, 1995 OK CR 72, 909 P.2d 74, 84; Cannon v. State, 1995 OK CR 45, 904 P.2d 89, 97, cert. denied, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996).
[4] Walker v. State, 1994 OK CR 66, 887 P.2d 301, 307, cert. denied, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); Mitchell v. State, 1994 OK CR 70, 884 P.2d 1186, 1195, cert. denied, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).
[5] Walker, 887 P.2d at 307.
[6] Salazar v. State, 1996 OK CR 25, 919 P.2d 1120, 1127 (Court will review entirety of juror's voir dire examination when reviewing a challenge for cause).
[7] Knighton v. State, 1996 OK CR 2, 912 P.2d 878, 885, cert. denied, 519 U.S. 841, 117 S.Ct. 120, 136 L.Ed.2d 71.
[8] Fitzgerald v. State, 1998 OK CR 68, 972 P.2d 1157, 1170.
[9] Cannon, 904 P.2d at 98.
[10] Porter v. State, 1983 OK CR 100, 666 P.2d 784, 786; Brown v. State, 50 Okl.Cr. 103, 297 P. 303, 305 (1931).
[11] See, e.g., Rock v. Arkansas, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (state may not impose per se rule against hypnotically refreshed evidence which prevents defendant from meaningful testimony); Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (state statute may not require defendant to testify first before calling other defense witnesses); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (state may not forbid compulsory process for defense to call co-defendant or accomplice as witness). Malicoat also directs us to Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). In Herring the United States Supreme Court found a state statute allowing the trial court to prohibit the defendant from making closing argument violated the Sixth Amendment right to effective counsel. The Court reasoned that the persuasive summation called for in closing argument was an important step in the adversarial process. Herring was specifically limited to closing argument. We find that opening statements, in which argument is not appropriate, do not serve the same purpose as closing argument, and are not persuaded by the analogy to Herring.
[12] Hammon v. State, 1995 OK CR 33, 898 P.2d 1287, 1306; Ruckman v. State, 1954 OK CR 159, 276 P.2d 278, 279.
[13] White v. State, 1998 OK CR 69, 973 P.2d 306, 311; Hooks v. State, 1993 OK CR 41, 862 P.2d 1273, 1278-79, cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994). But see Revilla v. State, 1994 OK CR 24, 877 P.2d 1143, 1150, cert. denied, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995) (any error invited where qualified emergency room doctor, on re-cross examination, gave opinion child's injuries were "non-accidental trauma").
[14] Fairchild v. State, 1999 OK CR 49, 70 OBJ 3659, 3662, 992 P.2d 350, 357-358. 1999 WL 1138585. I dissented on this issue in Fairchild.
[15] In reaching this conclusion the trial court conducted a version of the "strict elements" test, which requires a commonality of elements between the charged offense and the lesser included offense, except that the lesser included is missing an element existing in the charged offense. The trial court inexplicably found that depraved mind murder included all elements of child abuse murder except one, but was not a lesser included offense of child abuse murder. Although the trial court appears to have reasoned backwards, we will not disturb the result.
[16] Welch v. State, 1998 OK CR 54, 968 P.2d 1231, 1241; Willingham v. State, 1997 OK CR 62, 947 P.2d 1074, 1081-82, cert. denied, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998), overruled in part by Shrum v. State, 1999 OK CR 41, 991 P.2d 1032.
[17] This Court has held that depraved mind murder is, in some cases, a lesser included offense of child abuse murder. Evans v. State, No. F-97-1215, April 8, 1999 (not for publication). However, I do not believe the evidence in this case supported an instruction for depraved mind murder. We need not decide whether Malicoat was entitled to this instruction as a matter of law. I note this Court recently held that child abuse murder is a general intent crime. Fairchild, 70 OBJ at 3662, 992 P.2d at 357-358, 1999 WL 1138585. Using the Fairchild analysis, one might conclude that second degree depraved mind murder cannot be a lesser included offense of child abuse murder; common sense shows a lesser included offense should not have an intent element greater than that of the charged offense.
[18] 1989 OK CR 1, 771 P.2d 224, 228.
[19] State v. Johnson, 1992 OK CR 72, 877 P.2d 1136, 1140; Howard v. City of Tulsa, 1986 OK CR 5, 712 P.2d 797, 798.
[20] 70 OBJ at 3662, 992 P.2d at 357-358, 1999 WL 1138585.
[21] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). These cases set forth the minimum findings of intent or personal culpability necessary before capital punishment may be imposed.
[22] Fairchild, 70 OBJ at 3673, 992 P.2d at 370, 1999 WL 1138585.
[23] I believe an Enmund/Tison determination is necessary where the finding of guilt does not require a finding of personal culpability. See Fairchild, 70 OBJ at 3678-79, 992 P.2d at 375-377, 1999 WL 1138585 (Chapel, J., dissenting).
[24] Ochoa v. State, 1998 OK CR 41, 963 P.2d 583, 603, cert. denied, 526 U.S. 1023, 119 S.Ct. 1263, 143 L.Ed.2d 358 (1999).
[25] Salazar, 919 P.2d at 1123.
[26] Ochoa, 963 P.2d at 603.
[27] Charm v. State, 1996 OK CR 40, 924 P.2d 754, 762-63, cert. denied, 520 U.S. 1200, 117 S.Ct. 1560, 137 L.Ed.2d 707 (1997); Cannon, 904 P.2d at 106.
[28] Charm, 924 P.2d at 763.
[29] Ochoa, 963 P.2d at 596.
[30] I continue to maintain that unadjudicated offenses should not be used to support this aggravating circumstance. See Hooper v. State, 1997 OK CR 64, 947 P.2d 1090, 1107 n. 55, cert. denied, 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998). I yield my view to that of the majority.
[31] Hooper, 947 P.2d at 1107. This Court has looked with disfavor on the use of the circumstances of the crime to support this aggravating circumstance. Perry v. State, 1995 OK CR 20, 893 P.2d 521, 536. I have disagreed with the use of circumstances of the crime to support this aggravating circumstance. Cannon, 904 P.2d at 106, n. 60. However, I yield my view to that of the majority.
[32] Cheney, 909 P.2d at 80.
[33] Le v. State, 1997 OK CR 55, 947 P.2d 535, 550, cert. denied, 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).
[34] Cheney, 909 P.2d at 80.
[35] 12 O.S.1991, § 2702.
[36] Gabus v. Harvey, 1984 OK 4, 678 P.2d 253, 255.
[37] Cheney, 909 P.2d at 81-82. But see Hawkins v. State, 1994 OK CR 83, 891 P.2d 586, 597, cert. denied, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995) (mental torture during kidnapping preceding murder sufficient to support aggravating circumstance).
[38] Zant v. Stephens, 462 U.S. 862, 878-79, 103 S.Ct. 2733, 2743-44, 77 L.Ed.2d 235 (1983).
[39] For this reason we agree Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) does not apply. There, the United States Supreme Court upheld a sentence of death where an aggravating circumstance exactly duplicated the elements of the offense, finding the narrowing function necessary for death-eligibility occurred at the guilt, rather than sentencing, phase.
[40] Miller v. State, 1998 OK CR 59, 977 P.2d 1099, 1112-13; Turrentine v. State, 1998 OK CR 33, 965 P.2d 955, 975, cert. denied, 522 U.S. 1079 119 S.Ct. 624, 142 L.Ed.2d 562; Mollett v. State, 1997 OK CR 28, 939 P.2d 1, 14, cert. denied, 522 U.S. 1079, 118 S.Ct. 859, 139 L.Ed.2d 758 (1998); Johnson v. State, 1996 OK CR 36, 928 P.2d 309, 318; Richie v. State, 1995 OK CR 67, 908 P.2d 268, 278, cert. denied, 519 U.S. 837, 117 S.Ct. 111, 136 L.Ed.2d 64 (1996).
[41] Cummings v. State, 1998 OK CR 45, 968 P.2d 821, 836, cert. denied, 526 U.S. 1162, 119 S.Ct. 2054, 144 L.Ed.2d 220 (1999); Bryan v. State, 1997 OK CR 15, 935 P.2d 338, 365, cert. denied, 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299; Malone v. State, 1994 OK CR 43, 876 P.2d 707, 715-16.
[42] Cannon v. State, 1998 OK CR 28, 961 P.2d 838, 855; Le, 947 P.2d at 552-53.
[43] See, e.g., Mollett, 939 P.2d at 11. I have consistently stated that the jury should be informed of the meaning of life without parole. See, e.g., Ochoa, 963 P.2d at 605 n. 100; Mollett, 939 P.2d at 15 (Chapel, J., concurring in result); Johnson, 928 P.2d at 321 (Chapel, J., specially concurring); Smallwood v. State, 1995 OK CR 60, 907 P.2d 217, 239, cert. denied, 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996) (Chapel, J., specially concurring); McGregor v. State, 1994 OK CR 71, 885 P.2d 1366, 1383 n. 59, cert. denied, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995) (concurring by reason of stare decisis). Our error in failing to require instruction as to the meaning of life without parole is of constitutional magnitude and has, in my judgment, resulted in death sentences for many who would otherwise have received the life without parole sentence.
[44] Le, 947 P.2d at 551.
[45] Bryan, 935 P.2d at 365.
[46] Le, 947 P.2d at 554.
[47] 20 O.S.1991, § 3001.1.
[48] Hooper, 947 P.2d at 1110.
[49] Darden v. Wainwright, 477 U.S. 168, 181-82, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986).
[50] See, e.g., Le, 947 P.2d at 555 (State should refrain from unwarranted personal criticism or name-calling); Hammon, 898 P.2d at 1307 (prosecutor jeopardized case by arguing defendant was a thief, robber, possessor of stolen property, and murderer).
[51] Hamilton v. State, 1997 OK CR 14, 937 P.2d 1001, 1010-11, cert. denied, 522 U.S. 1059, 118 S.Ct. 716, 139 L.Ed.2d 657 (1998). See also Le, 947 P.2d at 555 (argument that mitigating evidence does not show defendant's innocence is irrelevant and improper personal opinion, but does not tell jury to disregard mitigating evidence).
[52] Powell v. State, 1995 OK CR 37, 906 P.2d 765, 776-77, cert. denied, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996); Pickens v. State, 1993 OK CR 15, 850 P.2d 328, 342, cert. denied, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).
[53] Le, 947 P.2d at 555; McCarty v. State, 1988 OK CR 271, 765 P.2d 1215, 1220; Brown v. State, 1988 OK CR 59, 753 P.2d 908, 913.
[54] Harjo v. State, 1994 OK CR 47, 882 P.2d 1067, 1076, cert. denied, 514 U.S. 1131, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995).
[55] The State never fully understood this ruling, continually returning to a time line. The trial court repeatedly emphasized that the ruling had nothing to do with when any injuries occurred, but focused on whether the injuries contributed to Tessa's death.
[56] 1996 OK CR 22, 918 P.2d 384, 393.
[57] The State appears to misunderstand the law on res gestae, directing this Court to a series of cases regarding election of offenses for child sexual abuse. These are completely irrelevant to whether the other crimes here were closely connected to the charged offenses.
[58] Rogers v. State, 1995 OK CR 8, 890 P.2d 959, 971, cert. denied, 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215.
[59] Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
[60] 12 O.S.1991, § 2401.
[61] 12 O.S.1991, §§ 2402, 2403.
[62] 12 O.S.1991, § 2602.
[63] 12 O.S.1991, § 2701.
[64] Fairchild, 70 OBJ at 3662, 992 P.2d at 357-358, 1999 WL 1138585. I would find this evidence properly admitted as it is relevant on the issue of intent to commit child abuse.
[65] Cargle v. State, 1995 OK CR 77, 909 P.2d 806, 830, 835, cert. denied, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996).
[66] Turrentine, 965 P.2d at 974.
[67] Livingston v. State, 1995 OK CR 68, 907 P.2d 1088, 1094.
[68] Le, 947 P.2d at 548.
[69] Hooper, 947 P.2d at 1111; Bryan, 935 P.2d at 361; Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).
[70] Bryan, 935 P.2d at 361.
[71] United States v. Cronic, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984).
[72] Bryan, 935 P.2d at 361; LaFevers v. State, 1995 OK CR 26, 897 P.2d 292, 306, cert. denied, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996).
[73] Hooper, 947 P.2d at 1111; McGregor, 885 P.2d at 1381.
[74] Lockhart v. Fretwell, 506 U.S. 364, 369-70, 113 S.Ct. 838, 842-43, 122 L.Ed.2d 180 (1993).
[75] Bryan, 935 P.2d at 363.
[76] Fairchild, 70 OBJ at 3662, 992 P.2d at 357-358, 1999 WL 1138585. I continue to maintain that child abuse murder is a specific intent crime, and believe evidence of intent would be relevant to defend against that charge. However, I believe counsel's decision not to present this evidence was sound strategy, given the evidence of intent already before the jury.
[77] Valdez v. State, 1995 OK CR 18, 900 P.2d 363, 388, cert. denied, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341.
[78] Malicoat's Application for Evidentiary Hearing, filed March 1, 1999, is DENIED.
[79] Bryan, 935 P.2d at 365-66.
[1] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).
[2] Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).